UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| OLSON KUNDIG, INC., | CASE NO. C22-0825JLR |
| Plaintiff, | ORDER |
| v. | |
| 12TH AVENUE IRON, INC., | |
| Defendant. | |

## I.   INTRODUCTION

Before the court is Plaintiff Olson Kundig, Inc.'s ("Olson Kundig") motion for a
preliminary injunction.  (Mot. (Dkt. # 6); Reply (Dkt. # 18).)  Defendant 12th Avenue
Iron, Inc. ("12th Avenue Iron") opposes the motion.  (Resp. (Dkt. # 14).)  The court has

//

//

//

//

1    considered the parties' submissions, the balance of the record, and the applicable law.

2    Being fully advised,[1] the court GRANTS Olson Kundig's motion.

3    ## II.    BACKGROUND

4        This dispute stems from the parties' business dealings with respect to the "Tom

5    Kundig Collection"—a hardware and home furnishings line designed by Mr. Kundig and

6    manufactured and sold by 12th Avenue Iron.  (*See generally* Compl. (Dkt. # 1) ¶¶ 1,

7    18-28, 39-43, 46-51.)

8    **A.    The Parties**

9        Stephen Marks is a founder and the current owner of 12th Avenue Iron, and he has

10   been managing and operating the business since it began in 2006.  (Marks Decl. (Dkt.

11   # 15) ¶ 2; *see also* Answer (Dkt. # 12) ¶ C7[2] (stating that Mr. Marks "has decades of

12   experience in metalworking – forging, welding, fabrication, casting, machining, and

13   high-end finishing").)  12th Avenue Iron "designs, builds, and installs custom

14   architectural metalwork, sculpture, and furniture for commercial, residential, and public

15   environments."  (Marks Decl. ¶ 2 (noting that 12th Avenue Iron sometimes "provides

16   hand sketches, detailed shop drawings, and/or sophisticated 3-dimensional CAD

17   renderings before fabrication begins in the shop").)

18

19   ---

20       [1] Neither party has requested oral argument (*see* Mot. at 1; Resp. at 1), and the court has determined that oral argument would not be helpful to its disposition of the motions, *see* Local Rules W.D. Wash. LCR 7(b)(4).

21       [2] Because 12th Avenue Iron separately numbers the paragraphs in the counterclaim section of its answer (*see* Answer at 13-23), the court uses "C" to refer to the paragraphs in the counterclaim section.

22

1    Tom Kundig is a distinguished architect and an owner and design principal of

2    Olson Kundig, an architectural firm.  (*See* Compl. ¶¶ 10-11 ("Mr. Kundig has received

3    some of the world's highest design honors . . . .").)  Olson Kundig "has been a worldwide

4    leader in architectural design for several decades"; its work "encompasses museums,

5    commercial and mixed-use design, exhibit design, interior design, places of worship, and

6    residences."  (*Id.* ¶ 10 ("The firm has won more than 70 regional and national American

7    Institute of Architects ("AIA") awards" and its "work has been published in the New

8    York Times, Architectural Digest, and Architectural Record.").)

9    **B.    The Tom Kundig Collection**

10    In or about December 2009, Olson Kundig approached 12th Avenue Iron to

11    discuss "the formation of a business relationship between the two companies."  (*See*

12    Compl. ¶ 12; Answer ¶ 10; *see also* Marks Decl. ¶ 7.)  During the parties' discussions,

13    12th Avenue Iron "expressed interest in partnering with Olson Kundig to fabricate a line

14    of Olson Kundig's design."  (*See* Compl. ¶ 13; *see also* Marks Decl. ¶ 8 ("As 12th Ave.

15    Iron completed custom projects for some of Kundig's customers, I had the idea of

16    creating a product line for hardware and home furnishings."); Parwani Decl. (Dkt. # 7)

17    ¶ 13, Ex. 6 (meeting notes between 12th Avenue Iron and Olson Kundig regarding 12th

18    Avenue Iron's business relationship proposition).)  12th Avenue Iron proposed that its

19    official website "would have a section dedicated to Olson Kundig's product line(s) where

20    customers could order online" and that it would be responsible for all sales transactions

21    as well as delivery and shipping of the products designed by Olson Kundig.  (*See* Compl.

22    ¶¶ 14-15; *see also* Answer ¶¶ 12-14; Parwani Decl. ¶ 14, Ex. 7 (meeting notes between

1  12th Avenue Iron and Olson Kundig regarding 12th Avenue Iron's website proposition).)

2  The parties "agreed that it would be a good idea for Olson Kundig to start designing

3  small products at the beginning such as coat hooks, shelf brackets, door hardware, and

4  drawer pulls." (*See* Compl. ¶ 17; Answer ¶ 15.)  The parties would call the line of

5  products the "Tom Kundig Collection."  (*See* Compl. ¶ 27; Answer ¶ C13.)

6          According to Olson Kundig, "in or about June 2010, the parties incorporated the

7  essential terms from the parties' discussions into an official Product Development

8  Product Development [sic], Manufacturing and Marketing Agreement (the

9  'Agreement')."[3]  (Compl. ¶ 18; Parwani Decl. ¶¶ 15-16, Ex. 8 ("Agreement").)  The

10  Agreement defines Olson Kundig as the "Architect" and 12th Avenue Iron as the

11  "Manufacturer." (Agreement at 1.)  It states that the parties "desire to establish a

12  collaborative relationship for the design and development of various products including,

13  without limitation, doorknobs, pulls, lights and similar products (the 'Products'), pursuant

14  to which Architect will design Products for manufacture and sale by Manufacturer to the

15  public." (*Id.*)  The Agreement also sets forth the parties' rights and responsibilities with

16  respect to the Tom Kundig Collection products:

17          **1.1.   Design.**   Architect shall be solely responsible for performing all
        design work related to the Products ("Product Designs") from which
18      Manufacturer shall develop shop drawings of sufficient detail to enable the

19

        ───────────────────

20  [3] As discussed in more detail below, *see infra* Section III.B.1, Mr. Marks states that he
    never negotiated or discussed the terms of the Agreement with Mr. Kundig.  (Marks Decl.
21  ¶¶ 35-38 (stating that he was presented with the Agreement, but never signed it).)  Instead,
    according to Mr. Marks, the parties moved forward with the Tom Kundig Collection based on an
22  "oral agreement [between Mr. Kundig and Mr. Marks] that the product line would be a joint
    partnership and both parties would fully participate in developing the products from start to
    finish." (*See id.* ¶¶ 10, 37-41; Answer ¶ C13.)

ORDER - 4

manufacture of the Products ("Shop Drawings"). . . . Architect shall have sole control over the branding of the Products, and shall have sole and final authority regarding the placement and appearance of trademarks on the Products.

**1.2.   Manufacture.**

    **(a) Prototypes.**  Manufacturer shall build, assemble and manufacture Product prototypes ("Prototypes") in accordance with the approved Shop Drawings for inspection and final approval by Architect. . . . Architect's approval of a Prototype shall be required prior to the manufacturing of any Products for sale to Customers, provided, however, that the Parties shall mutually agree whether any Product Designs provided by Architect or Prototypes manufactured by Manufacturer will be manufactured as Products and made available to Customers, and Architect's approval of a Prototype shall not obligate Manufacturer to manufacture a Product for sale to Customers.

    **(b) Products.**  Subject to Architect's approval of a Prototype, Manufacturer shall build, assemble and manufacture the Product in accordance with the Product Design and with mutually agreed-upon quality and material requirements, or in accordance with written guidelines providing for the same.  Architect shall have the right to conduct quality control audits or otherwise inspect and approve the manufacturing processes and facilities of Manufacturer and the processes and facilities of any third party contracted by Manufacturer to perform work to confirm that the Products are manufactured according to Product Design specifications and quality requirements.

    **(c)   Manufacturing   Matters:    Third-Party   Contractors.** Manufacturer shall be solely responsible for all matters and costs relating the building, assembling and manufacturing of Prototypes and Products, subject to Architect's quality control rights . . . . The parties agree that Manufacturer is under no obligation to build, assemble or manufacture Prototypes or Products for every Product Design provided by Architect . . . .

**1.3.   Sales and Marketing.**

    **(a) Distribution.**  Product sales shall initially be carried out through a web site owned and/or controlled by Manufacturer . . . .

**(b) Marketing.**   Manufacturer shall be responsible for the performance of any and all marketing activities related to the Products . . . .

**(c) Inventory.**  Manufacturer shall be solely responsible for managing the Product inventory . . . . Manufacturer shall be solely responsible for all costs associated with inventory management and shall bear all responsibility for order fulfillment.   Manufacturer shall be solely responsible for invoicing Customers for Products sold, collecting payments and remitting a portion of the gross amounts received from sales to Architect . . . provided, however, that if Manufacturer is unwilling or unable to collect such payments, Manufacturer shall be deemed to have automatically assigned the right to collect payments to Architect.

\* \* \*

**1.4.    Pricing and Royalty.**  Manufacturer shall be solely responsible for determining the price point at which the Products will be sold to Customers. For and in consideration of the license granted to Manufacturer and Architect's other obligations under this Agreement, Manufacturer shall pay Architect a royalty of seven percent (7%) of the gross amount received from the sale of products (the "Royalty")..)

\* \* \*

**2.1.    Ownership of Products.**  Architect shall own all intellectual property rights in and to the Products.  For the purposes of this Agreement, Intellectual Property Rights means, any and all proprietary rights of any kind, tangible or intangible, now known or hereafter existing, including without limitation, copyrights, neighboring rights and moral rights; trade secret; trademark; patent and other industrial property rights, and all registrations, and applications thereof now or hereafter in force throughout the universe. Architect shall have the sole and exclusive right to enforce any and all Intellectual Property Rights in the Products including, without limitation, by filing or and maintaining trademark, patent and copyright protection for the Products as appropriate.  Manufacturer hereby irrevocably transfers, assigns and conveys to Architect any and all rights Manufacturer may have in and to the Products.[4]

---

[4] The intellectual property at issue in the instant motion includes:  (1) the D197, D352, D422, and D933 Design Patents; (2) the OLSON KUNDIG trademark; and (3) the TOM KUNDIG COLLECTION trademark.  (*See generally* Compl. at 8-17; 19-21.)

* * *

    **2.3.   License.**   Architect hereby grants Manufacturer under Architect's
Intellectual Property Rights, a limited, non-exclusive worldwide,
royalty-bearing, non-transferrable, non-sublicensable license to
manufacture, market and sell the Products in accordance with the terms
hereof during the term of this Agreement. (*Id.* ¶ 2.3.)

(*Id.* ¶¶ 1.1-1.4, 2.1, 2.3.)

    The Agreement provides that it shall continue until terminated by either party "for

any or no cause upon thirty (30) days written notice provided in accordance with" the

terms of the Agreement. (*See id.* ¶ 3.1; *id.* ¶ 3.2 (referencing Section 8.4 with respect to

written notice); *see also id.* ¶ 3.3 (stating that either party may also terminate the

Agreement "if the other [p]arty breaches any of its material obligations under [the]

Agreement and such breach is not cured within fifteen (15) days of receiving written

notice of such breach").)  Upon termination, the Agreement requires 12th Avenue Iron to

"take all steps to immediately cease activities related to the manufacture or marketing of

Products" and "immediately cease accepting orders for Products, provided, however, that

Manufacturer may continue to manufacture Products for the fulfillment of orders placed

prior to the effective date of termination." (*Id.* ¶ 3.2.)  The Agreement explicitly states

that 12th Avenue Iron's "obligation to pay Royalties" survives any termination of the

Agreement. (*Id.*)

    The parties did not sign the Agreement. (*See* Compl. ¶ 26; Parwani Decl. ¶ 16; *see*

*also* Marks Decl. ¶ 36 (stating that Mr. Marks received the Agreement but that "no one

from [Olson] Kundig ever followed up with [him] about the document or requested [his]

1    signature").)  Nevertheless, they began their business relationship in June 2010.  (*See*

2    Compl. ¶ 27; Parwani Decl. ¶ 16.)  Leading up to the Tom Kundig Collection's launch in

3    2012, the parties worked together to create the Tom Kundig Collection products.  (*See*

4    Marks Decl. ¶ 11.)  Mr. Kundig designed and sketched the products and then Debbie

5    Kennedy, a senior interior designer at Olson Kundig, converted the sketch into a

6    computer drawing with rough dimensions and designs.  (*See* Marks Decl. ¶ 11; *see also*

7    Compl. ¶ 31 ("Mr. Kundig invested significant time and effort into designing each piece

8    of the Tom Kundig Collection.").)  Olson Kundig provided the rough designs to 12th

9    Avenue Iron, and 12th Avenue Iron made prototypes based on the designs, determined

10   "the best way to fabricate, weld, and finish the product," and manufactured the final

11   product.[5]  (*See* Marks Decl. ¶ 11; *see also id.* ¶ 12 (discussing Mr. Marks's contributions

12   to the Tom Kundig Collection, which include, among other things, research[ing] all the

13   suppliers, recruit[ing] the vendors, over[seeing] several rounds of shop drawings for each

14   piece, and [making] multiple rounds of prototypes to get the machinery dialed in"); *id.*

15   ¶ 39 (same).)

16        The Tom Kundig Collection officially launched in 2012.  (Compl. ¶¶ 27, 36;

17   Marks Decl. ¶¶ 11, 39.)  It initially "consisted of 25 small-scale steel pieces including

18   cabinet pulls, rollers and door handles," but eventually "expanded to a compendium of

19   over 125 products, including furniture, lighting, and household tools."  (Compl. ¶¶ 29-30,

20

21   ───────────────
          [5] Mr. Marks "had veto power over proposed products for the [Tom Kundig] Collection if
22   the product could not be made to [his] exacting quality standards, but also efficiently and
     economically."  (*See* Marks Decl. ¶ 12.)

33.)  Since the Collection's launch in 2012, 12th Avenue Iron has been responsible for

selling, marketing, delivering, and shipping the Tom Kundig Collection products and the

entire Tom Kundig Collection "has been commercially available for customers to

purchase through 12th Avenue Iron's official website." (*Id.* ¶ 28; *see also* Marks Decl.

¶¶ 13-14.)  Both parties devoted substantial time, effort, and resources into the

development and promotion of the Tom Kundig Collection products over the last decade.

(*See, e.g.*, Compl. ¶¶ 27-35, 57-60; Parwani Decl. ¶¶ 6, 34; Marks Decl. ¶¶ 12, 39, 42;

Answer ¶¶ C14-C16.)

**C.    Termination of the Business Relationship Between Olson Kundig and 12th Avenue Iron and Commencement of this Lawsuit**

According to Olson Kundig, the parties performed their obligations in accordance

with the terms of the Agreement for many years, despite not having signed the

Agreement.  (*See, e.g.*, Compl. ¶¶ 36-39; Parwani Decl. ¶¶ 20-21 (including a chart

showing that 12th Avenue Iron paid Olson Kundig royalties for gross sales of products in

the Tom Kundig Collection every year from 2012 until the third quarter of 2020).)

However, starting in the fourth quarter of 2020, 12th Avenue Iron stopped paying Olson

Kundig any royalties for the sales of Tom Kundig Collection products.  (*See* Compl. ¶ 41;

Parwani Decl. ¶ 21 (noting that 12th Avenue Iron similarly failed to pay any royalties in

2021 and 2022).)  Additionally, Olson Kundig "learned from its own clients that, despite

accepting money for orders of products in the Tom Kundig Collection, 12th Avenue Iron

stopped timely fulfilling those orders in 2020, around the same time 12th Avenue Iron

stopped paying royalties to Olson Kundig." (Parwani Decl. ¶ 22; *id.* ¶ 37 (stating that

1    customers complained to Olson Kundig regarding 12th Avenue Iron's services and

2    failure to timely produce orders and asked Olson Kundig to do something regarding the

3    issues); Compl. ¶ 40.)  Mr. Marks states that the loss of 12th Avenue Iron's long-time

4    employee, the buyout of 12th Avenue Iron's co-founder, and Mr. Marks's serious health

5    issues, in combination with the COVID-19 pandemic, "crippled 12th Ave[nue] Iron and

6    caused a backlog of work, missed deadlines, and the temporary inability to fulfil

7    [sic][Tom Kundig] Collection orders."  (*See* Marks Decl. ¶ 16.)

8          According to Olson Kundig, it "attempted to work with 12th Avenue Iron to find a

9    solution to help it fulfil [sic] orders, but was unable to find a solution that would work

10   and 12th Avenue Iron continued to accept more orders and continued to not pay any

11   royalties."  (Parwani Decl. ¶ 23; *see also* Marks Decl. ¶¶ 18-27 (discussing 12th Avenue

12   Iron's attempt to work with, Argent Fabrication, LLC ("Argent"), a third-party metal

13   hardware and furniture fabricating company, to fulfill its orders).)  On April 28, 2022,

14   after "failing to find solutions short of termination of the Agreement," Olson Kundig

15   notified 12th Avenue Iron that it had breached the Agreement by failing to timely pay

16   royalties and fulfill orders and that Olson Kundig intended to terminate the Agreement in

17   accordance with Paragraphs 3.2 and 3.3 of the Agreement.  (*See* Parwani Decl. ¶¶ 24-25,

18   Ex. 10 (breach and termination notice letter); Compl. ¶¶ 42-47 (alleging that 12th Avenue

19   Iron materially breached the Agreement).)

20         12th Avenue Iron failed to take any action to remedy the alleged breaches.  (*See*

21   Parwani Decl. ¶ 26; Compl. ¶ 48.)  Thus, according to Olson Kundig, the Agreement was

22   terminated no later than May 28, 2022.  (*See* Compl. ¶ 49; Agreement ¶ 3.2 (noting that

the Agreement could be terminated by either party upon 30 days written notice); *id.* ¶ 3.3 (stating that a party may terminate the Agreement if the other party breaches its obligations under the Agreement and fails to cure such breach within 15 days of receiving written notice of the same).)  12th Avenue Iron did not, however, cease its activities related to the manufacture, marketing, and sale of Tom Kundig Collection products.  (*See* Compl. ¶¶ 51-56 (alleging that 12th Avenue Iron continues to use Olson Kundig's intellectual property without a license); Resp. at 14 (admitting ongoing use of Olson Kundig's intellectual property through 12th Avenue Iron's continued sale and manufacturing of the Tom Kundig Collection products); Marks Decl. ¶¶ 46-47, Exs. F-G (discussing 12th Avenue Iron's 2022 sales of and orders for Tom Kundig Collection products); Parwani Decl. ¶¶ 17-18, 28-31, Exs. 9, 11-14 (including screenshots from 12th Avenue Iron's website showing that it offered Tom Kundig Collection products for sale in June 2022); *see also* Agreement ¶ 3.2 (describing post-termination duties).)

As a result, Olson Kundig commenced this case against 12th Avenue Iron on June 12, 2022.  (*See generally* Compl.)  Olson Kundig brings claims against 12th Avenue Iron for:  breach of contract; infringement of the D352, D197, D933 and D422 Design Patents (the "Design Patents") under 35 U.S.C. § 271; infringement of the OLSON KUNDIG trademark under 15 U.S.C. § 1114; infringement of the TOM KUNDIG COLLECTION trademark under Washington common law; violation of the Washington Personality Rights Act ("WPRA"), RCW 63.60.010 *et seq.*; and violation of the Washington Consumer Protection Act ("WCPA"), RCW 19.86.010 *et seq.*  (*See* Compl. at 10-20.)  On

1 June 30, 2022, Olson Kundig filed the instant motion for a preliminary injunction. (*See*

2 *generally* Mot.; Dkt.)

3                                                   **III.   ANALYSIS**

4         Olson Kundig asks the court to preliminarily "enjoin[] 12th Avenue Iron from

5 continued breach of post-termination obligations under the Agreement and continued

6 infringement of the D352, D197, D933 and D422 Design Patents, the TOM KUNDIG

7 COLLECTION mark, the OLSON KUNDIG mark, and direct[] 12th Avenue Iron to

8 remove the Tom Kundig Collection line, and all mention of Tom Kundig or association

9 with Olson Kundig, from its official website immediately." (Mot. at 19.) The court

10 begins by setting forth the relevant legal standard before turning to Olson Kundig's

11 motion.

12 **A.   Legal Standard**

13         "A preliminary injunction is an extraordinary remedy never awarded as of right."

14 *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008) (citing *Munaf v. Geren*, 553

15 U.S. 674, 689-90 (2008)). "[T]he basic function of a preliminary injunction is to preserve

16 the *status quo ante litem* pending a determination of the action on the merits." *L.A.*

17 *Mem'l Coliseum Comm'n v. Nat'l Football League*, 634 F.2d 1197, 1200 (9th Cir. 1980).

18 Under Federal Rule of Civil Procedure 65(b), a party seeking a preliminary injunction

19 must show: (1) a likelihood of success on the merits; (2) a likelihood of suffering

20 irreparable harm in the absence of preliminary relief; (3) that the balance of equities

21 //

22 //

1  in its favor; and (4) that an injunction is in the public interest.[6]  *Winter*, 555 U.S. at 20.

2  The moving party bears the burden of persuasion and must make a clear showing that it is

3  entitled to such relief.  *See id.*  "In each case, courts 'must balance the competing claims

4  of injury and must consider the effect on each party of the granting or withholding of the

5  requested relief.'"  *Id.* at 24 (quoting *Amoco Prod. Co. v. Vill. of Gambell, AK*, 480 U.S.

6  531, 542 (1987)).

7  **B.    Likelihood of Success on the Merits**

8         Although the plaintiff "carr[ies] the burden of demonstrating a likelihood of

9  success, they are not required to prove their case in full at this stage but only such

10 portions that enable them to obtain the injunctive relief they seek."  *M.M.M. on Behalf of*

11 *J.M.A. v. Sessions*, 347 F. Supp. 3d 526, 532-33 (S.D. Cal. 2018) (citing *Univ. of Texas v.*

12 *Camenisch*, 451 U.S. 390, 395 (1981)).  Olson Kundig requests injunctive relief in

13 connection with its claims for:  (1) infringement of the Design Patents under 35 U.S.C.

14 § 271; (2) infringement of the OLSON KUNDIG trademark under 15 U.S.C. § 1114; and

15 (3) infringement of the TOM KUNDIG COLLECTION trademark under Washington

16 common law.  (*See generally* Compl. at 9-17, 19-21; Mot. at 7-14; Reply at 9-10.)

17 Before addressing whether Olson Kundig is likely to succeed on the merits of those

18 claims, the court considers two preliminary issues that are relevant to Olson Kundig's

19 likelihood of success.

20

21      [6] In the Ninth Circuit, a preliminary injunction is also proper "if there are serious
   questions going to the merits; there is a likelihood of irreparable injury to the plaintiff; the
   balance of hardships tips sharply in favor of the plaintiff; and the injunction is in the public
22 interest."  *Lopez v. Brewer*, 680 F.3d 1068, 1072 (9th Cir. 2012).

ORDER - 13

1     1.  Preliminary Issues

2         The parties dispute whether Olson Kundig and 12th Avenue Iron are partners with

3 respect to the Tom Kundig Collection or whether the Agreement governs their

4 relationship with respect to the Collection.  Olson Kundig argues that the unsigned

5 Agreement is enforceable, and thus:  (1) Olson Kundig owns the Design Patents and the

6 OLSON KUNDIG and TOM KUNDIG COLLECTION marks (the "Marks"); (2) 12th

7 Avenue Iron had only a limited, non-exclusive license to use the Design Patents and

8 Marks to manufacture, market, and sell Tom Kundig Collection products; and (3) Olson

9 Kundig's termination of the Agreement also terminated 12th Avenue Iron's license to use

10 Olson Kundig's Design Patents and Marks.  (*See* Reply at 2-9; Mot. at 10-15; Compl. at

11 10-17, 19-20.)  In response, 12th Avenue Iron contends that:  (1) the Agreement is not

12 enforceable because the parties did not sign it or agree to its terms; and (2) it is not liable

13 for infringement because the parties orally agreed that the Tom Kundig Collection would

14 be a partnership, and thus the parties co-own the Design Patents and Marks.  (*See* Resp.

15 at 8-12; Marks Decl. ¶¶ 10-12, 35-40.)  The court first considers whether Olson Kundig is

16 likely to succeed in establishing the existence of a binding contract before turning to

17 address whether 12th Avenue Iron is likely to succeed in establishing the existence of a

18 partnership.

19       *a.  Existence of an Enforceable Contract*

20         To establish the existence of an enforceable contract under Washington law, a

21 plaintiff must demonstrate that the parties manifested a mutual intent to be bound on the

22 essential terms of the agreement.  *McEachern v. Sherwood & Roberts, Inc.*, 675 P.2d

1   1266, 1268 (Wash. Ct. App. 1984).  Washington follows the "objective manifestation

2   test" to determine the existence of a contract.  *Keystone Land & Dev. Co. v. Xerox Corp.*,

3   94 P.3d 945, 949 (Wash. 2004).  The unexpressed subjective intent of the parties is

4   irrelevant; mutual assent is instead determined by looking to the parties' objective acts or

5   outward manifestations.  *Wilson Ct. Ltd. P'ship v. Tony Maroni's, Inc.*, 952 P.2d 590,

6   594 (Wash. 1998).  "Manifestation of assent requires either an acknowledgment of a

7   promise or performance under the terms of the agreement."  *Glacier Water Co., LLC v.

8   Earl*, No. C08-1705RSL, 2010 WL 3430518, at *1 (W.D. Wash. Aug. 30, 2010) (citing

9   Restatement (Second) of Contracts § 18 (Am. Law Inst. 2022)); *see also Jacob's

10  Meadow Owners Ass'n v. Plateau 44 II, LLC*, 162 P.3d 1153, 1166 (Wash. Ct. App.

11  2007) ("The existence of mutual assent may be deduced from the circumstances,

12  including the ordinary course of dealing between the parties.  Signatures of the parties are

13  not essential to the determination."  (citations omitted)).

14      Olson Kundig alleges that the Agreement, although unsigned, is enforceable

15  because the parties "expressed a mutual intention to be bound on the essential terms of

16  the Agreement" by "perform[ing] in compliance with the essential terms of the

17  Agreement for a decade."  (Mot. at 14-15; Reply at 3 (referencing 12th Avenue Iron's

18  statements, Mr. Marks' declaration, and Mr. Parwani's declaration and supporting

19  evidence).)  12th Avenue Iron, on the other hand, contends that Olson Kundig cannot

20  establish that the Agreement is enforceable because:  (1) the parties did not sign the

21  Agreement or discuss its terms; (2) genuine disputes of material fact exist regarding

22  whether there was a meeting of the minds with respect to the Agreement's terms; and

1  (3) the parties agreed to be partners with respect to the Tom Kundig Collection. (*See*

2  Resp. at 11-12; *see also id.* at 8-10 (alleging the existence of a partnership).)

3      At this preliminary stage, the court concludes that Olson Kundig is likely to

4  succeed in establishing that the Agreement is enforceable. First, Olson Kundig submits

5  the parties' meeting notes and correspondence regarding the formation of a business

6  relationship and demonstrates that the parties incorporated the essential terms from those

7  discussions into the Agreement. (*Compare* Parwani Decl. ¶¶ 12-14, Exs. 6-7, *with*

8  Agreement ¶¶ 1.1-1.4; *see also* Marks Decl. ¶ 58 (admitting that the meeting notes were

9  drafted by Mr. Marks).) Second, Olson Kundig submits substantial evidence establishing

10  that it is likely that the parties objectively manifested an intent to be bound by the

11  essential terms of the Agreement by performing in accordance with the Agreement's

12  essential terms for almost a decade. For example, the Agreement provides that "Product

13  sales shall initially be carried out through a web site owned and/or controlled by

14  Manufacturer" and "Manufacturer shall be responsible for the performance of any and all

15  marketing activities related to the Products"; "for managing the Product inventory"; "for

16  all costs associated with inventory management and shall bear all responsibility for order

17  fulfillment"; and "for invoicing Customers for Products sold [and] collecting payment."

18  (Agreement ¶ 1.3.) It is undisputed that 12th Avenue Iron's website has a section

19  dedicated to the sale of Tom Kundig Collection products and that 12th Avenue Iron was

20  solely responsible for invoicing customers and fulfilling orders. (*See* Marks Decl. ¶ 14.)

21      The Agreement also provides that "Manufacturer shall be solely responsible for

22  determining the price point at which the Products will be sold to Customers" and "shall

pay Architect a [quarterly] royalty of seven percent (7%) of the gross amount received

from the sale of Products." (Agreement ¶ 1.4.)  It appears that 12th Avenue Iron was

solely responsible for determining the price point of each of the products, again in

accordance with Agreement.  (*See, e.g.*, Parwani Decl. ¶ 17, Ex. 9 (submitting illustrative

captures from 12th Avenue Iron's website, which include the prices for each Tom Kundig

Collection product); Marks Decl. ¶¶ 46-47, Exs. F-G (listing prices for sales of custom

and standard Tom Kundig Collection products in the first and second quarters of 2022

and demonstrating that the prices may vary from those listed on the website and from

quarter to quarter).)  Additionally, 12th Avenue Iron admits, and Olson Kundig's Chief

Executive Officer, Hemanshu Parwani, submits a declaration stating, that for nearly ten

years, 12th Avenue Iron paid Olson Kundig a royalty of 7% quarterly, exactly in

accordance with the Agreement.  (*See* Resp. at 10;[7] Parwani Decl. ¶ 21.)

     With respect to licensing, the Agreement states that "Architect hereby grants

Manufacturer under Architect's Intellectual Property Rights, a limited, non-exclusive,

worldwide, royalty-bearing, non-transferrable, non-sublicensable license to manufacture,

market and sell the Products in accordance with the terms hereof during the term of this

Agreement." (Agreement at ¶ 2.3.)  12th Avenue Iron's argues that "[b]ecause 12th Ave.

Iron has been the sole fabricator and manufacturer of the [Tom Kundig] Collection since

it launched in 2012, it uses the Kundig mark and [Tom Kundig] Collection mark on its

---

[7] As discussed in greater detail below, *see infra* Section III.B.1.b, the court does not find
support in the current record for 12th Avenue Iron's implicit characterization of the 7%
payments as something other than a royalty (Resp. at 10).

1   website with Kundig's approval and authorization of the same." (Resp. at 14.) However,

2   the court agrees with Olson Kundig that, based on the current record, the only plausible

3   "approval and authorization" of 12th Avenue Iron's use of the Marks and Design Patents

4   comes from the license in the Agreement. (*See* Reply at 5-6.) Moreover, 12th Avenue

5   Iron's payment of royalties to Olson Kundig is consistent with the conclusion that the

6   parties objectively understood that 12th Avenue Iron had a license to use Olson Kundig's

7   intellectual property to manufacture, market, and sell the Tom Kundig Collection

8   products.

9        With respect to design and manufacturing, the Agreement provides that "Architect

10  shall be solely responsible for performing all design work related to the

11  Products . . . from which Manufacturer shall develop shop drawings of sufficient detail to

12  enable the manufacturer of the Products." (Agreement ¶ 1.1.) It further states that

13  "Manufacturer shall build, assemble and manufacture Product prototypes . . . in

14  accordance with the approved Shop Drawings . . . [and] Product Design" and that

15  "Manufacturer shall be solely responsible for all matters and costs relating the building,

16  assembling and manufacturing of Prototypes and Products," including "engaging and

17  supervising any third-party contractors necessary for the building, assembling or

18  manufacturing of the Prototypes and Products." (*Id.* ¶ 1.2 (providing that Olson Kundig

19  had to approve the prototype prior to the manufacturing of a product for sale to

20  customers, but that 12th Avenue Iron was under no obligation to manufacture every

21  product design provided by Olson Kundig).) Mr. Marks states in his declaration that Mr.

22  Kundig was responsible for the initial product sketches, and that Mr. Kundig would

1    provide his rough sketches to Ms. Kennedy, who would convert them into computer

2    drawings with rough dimensions and designs.[8]  (Marks Decl. ¶ 11.)  12th Avenue Iron

3    and Mr. Marks would then make shop drawings and prototypes and determine "the best

4    way to fabricate, weld and finish" the products based on Olson Kundig's designs.  (*Id.*

5    ¶¶ 11-12, 37; *see id.* ¶ 12 (alleging that Mr. Marks had "veto power over proposed

6    products for the [Tom Kundig] Collection").)  Therefore, it is undisputed that Olson

7    Kundig was responsible for the design of the products, and 12th Avenue Iron was

8    responsible for developing shop drawings based on Olson Kundig's design, in accordance

9    with the Agreement.  There is similarly no question that 12th Avenue Iron was

10   responsible, in accordance with the Agreement, for building, assembling, and

11   manufacturing the Tom Kundig Collection products based on approved prototypes and

12   product designs.  (*See, e.g.*, *id.* ¶ 37 (stating that "12th Ave. Iron essentially took it from

13   there – performing research, sourcing materials, lining up vendors, doing shop drawings

14   for our crew, and parts drawings for vendors"); *id.* ¶ 41 (stating that 12th Avenue Iron

15   was the sole manufacturer for the Tom Kundig Collection products; as such, Mr. Marks

16   had to "inform job superintendents or managing architects that they could not hand out

17   12th Ave[nue] Iron's product specification drawings to another fabrication shop and have

18   them build one of our products").)

19

20   ───────────────

     [8] The description of each product on 12th Avenue Iron website also states, "Designed by:

21   Tom Kundig."  (*See* Parwani Decl. ¶ 17, Ex. 9 (including illustrative captures of the products'
     webpages on the 12th Avenue Iron's website); *see also id.* ¶ 33, Ex. 15 (attaching an article from

22   12th Avenue Iron that states that "the Tom Kundig Collection from Olson Kundig" is 12th
     Avenue Iron's "first line of guest-authored design products").)

ORDER - 19

1     In sum, the parties' objective conduct over the past decade demonstrates that it is

2   likely that there was a mutual intent to be bound on the material terms of the Agreement.

3   The only source of contradictory evidence 12th Avenue Iron offers to negate Olson

4   Kundig's evidence of the parties' objective intent is Mr. Mark's uncorroborated

5   statements that the parties were instead partners.  However, as discussed below, the court

6   cannot presently conclude that 12th Avenue Iron is likely to succeed in establishing the

7   existence of a partnership.  Accordingly, the court concludes that Olson Kundig is likely

8   to establish that the Agreement is enforceable.

9          *b.  Existence of a Partnership*

10          In Washington, a partnership is "an association of two or more persons to carry on

11   as co-owners a business for profit."  RCW 25.05.005(6).  "A partnership agreement must

12   contemplate a common venture, a sharing of profits and losses, and a joint right of

13   control."  *Samra v. Singh*, 479 P.3d 713, 720 (Wash. Ct. App. 2020).  The burden of

14   proving a partnership is upon the party asserting its existence, and the "evidence must be

15   stronger where the dispute is between alleged partners rather than with a third party."  *Id.*

16          Where, as here, there is no express contract that identifies Olson Kundig and 12th

17   Avenue Iron as partners,[9] "the existence of a partnership depends on the intention of the

18   parties."  *Id.*  "That intention must be ascertained from all of the facts and circumstances

19   and the actions and conduct of the parties."  *Malnar v. Carlson*, 910 P.2d 455, 461

20   (Wash. 1996).  "Facts gleaned from the parties' conduct are preferred over anything the

21

22          [9] The Agreement explicitly states that it "does not create any agency, partnership, or joint
     venture relation between Architect and Manufacturer."  (Agreement ¶ 8.2.)

1    parties have said." *Samra*, 479 P.3d at 720; *DeFelice v. State, Emp. Sec. Dep't*, 351 P.3d

2    197, 201 (Wash. Ct. App. 2015) ("Just because the parties call their arrangement a

3    partnership does not make it a partnership.").  For instance, evidence that the parties

4    share profits and losses as well as a common partnership fund or shared account supports

5    the existence of a partnership, notwithstanding the absence of an express partnership

6    agreement.  *Samra*, 479 P.3d at 721 (finding no partnership in part because of the lack of

7    evidence regarding sharing profits and losses and where there was no evidence showing

8    that defendant ever deposited any of his own funds into the partnership account or had

9    authority to direct how the funds within that account were used); *Gottlieb Bros. v.*

10   *Culbertson's*, 277 P. 447, 449 (Wash. 1929) ("One of the most important tests of a

11   partnership or joint adventure is whether there is a share in losses.").

12        Here, the evidence presented does not lead the court to conclude that 12th Avenue

13   Iron is likely to succeed on its defense to liability—i.e., that a partnership exists between

14   Olson Kundig and 12th Avenue Iron and that they are thus co-owners of the Marks and

15   Design Patents.  (*See* Resp. at 8-10.)  While Mr. Marks claims that Olson Kundig and

16   12th Avenue Iron agreed to form a partnership with respect to the Tom Kundig

17   Collection (*see* Marks Decl. ¶ 10), there is little indicia of a partnership beyond his

18   statement.  For example, the record lacks evidence of a plausible profit-sharing structure

19   between Olson Kundig and 12th Avenue Iron.  Over the course of the parties'

20   relationship, the only money that Olson Kundig received was 7% from the gross amount

21   received from the sale of Tom Kundig Collection products each quarter.  (*See, e.g.*,

22   Parwani Decl. ¶ 21; Reply at 7.)  12th Avenue Iron asserts that the parties agreed on this

1   amount because the Collection "was [Mr. Marks's] idea" and "12th Ave[nue] Iron was

2   the one fronting all the time, resources, and effort to launch the [Tom Kundig] Collection

3   from start to finish." (Resp. at 10.)  However, 12th Avenue Iron provides no evidentiary

4   support for this assertion (*see id.*) and the court agrees with Olson Kundig that "[h]ad

5   there been a partnership, it would be unreasonable and extremely unfair for Olson Kundig

6   to only receive a 7% royalty from the gross amount received from the sale of Tom

7   Kundig Collection products, as opposed to receiving 50% profit" (Reply at 7).  *See*

8   *Samra*, 479 P.3d at 721 (finding no partnership in part because of the lack of evidence

9   regarding sharing profits and losses).  Additionally, there is no evidence that Olson

10  Kundig and 12th Avenue Iron shared losses.  (*See generally* Reply at 7 (describing 12th

11  Avenue Iron's various losses and stating that Olson Kundig never shared or carried any

12  burden for those losses); Resp. (citing no evidence that Olson Kundig and 12th Avenue

13  Iron shared losses); Marks Decl. (stating nothing about the sharing of losses)); *see also*

14  *Gottlieb Bros.*, 277 P. at 449 (requiring evidence of shared losses to establish existence of

15  partnership).  There is also no evidence of a partnership fund or account jointly owned or

16  operated by Olson Kundig and 12th Avenue Iron.  (*See generally* Reply at 7; Resp.

17  (citing no evidence of a joint account or fund); Marks Decl. (stating nothing about a joint

18  account or fund)); *see also Samra*, 479 P.3d at 721.

19          Finally, Mr. Marks states that when Olson Kundig asked Argent to assist 12th

20  Avenue Iron with its unfulfilled orders, he "was told that if the partnership between

21  Argent and 12th Ave[nue] Iron was successful, 12th Ave[nue] Iron and Argent's joint

22  venture would continue perhaps to merger, but if the partnership was unsuccessful,

1   neither company would get the product line." (Marks Decl. ¶ 22.)  The court agrees with

2   Olson Kundig, however, that "it is inconsistent with an alleged partnership that Olson

3   Kundig alone determined whether 12th Avenue Iron or Argent ultimately got the product

4   line." (Reply at 8.)  Mr. Marks's statement indicates the absence of a partnership because

5   it shows that 12th Avenue Iron lacked control over the Tom Kundig Collection's business

6   affairs. *See Eder v. Reddick*, 278 P.2d 361, 366 (Wash. 1955) (holding that plaintiff had

7   failed to establish existence of oral contract of partnership where no partnership fund or

8   account was ever established between the parties and plaintiff exercised no control over

9   the project except such as would be consistent with the duties of a foreman).

10      Where, as here, there is no express partnership agreement, circumstantial evidence

11   tends prove the existence of a partnership only if "is inconsistent with any other theory."

12   *Id.* at 366.  At this stage, the court concludes that the circumstantial evidence in the

13   record is inconsistent with 12th Avenue Iron's partnership theory and is instead

14   consistent with Olson Kundig's theory that the parties were bound by the Agreement.

15   *See supra* Section III.B.1.a.[10]

16   //

17   //

18   //

19   //

20

21   [10] The court also notes that even if 12th Avenue Iron had established the existence of a
     partnership, the mere fact that Olson Kundig and 12th Avenue Iron were partners would not
22   automatically render them joint owners with respect to the Marks and Design Patents, as
     discussed in more detail below.

2.  Infringement of the D352, D197, D933, and D422 Design Patents Under 35 U.S.C. § 271

To demonstrate likelihood of success on the merits of a design patent infringement claim, a plaintiff must establish the validity and infringement of its patent. *Reebok Int'l. Ltd. v. J. Baker, Inc.*, 32 F.3d 1552, 1555 (Fed. Cir. 1994).

Olson Kundig has established that the D352, D197, D933, and D422 Design Patents are registered with the United States Patent and Trademark Office ("USPTO") and that it is the named applicant and assignee for all four Design Patents. (*See* Parwani Decl. ¶¶ 8-11, Exs. 2-5 (naming Mr. Kundig as the inventor for all four Design Patents).[11]) In its response to the instant motion, 12th Avenue Iron does not dispute the validity of the Design Patents. (*See* Resp. at 13-15.) "[I]f a patentee moves for a preliminary injunction and the alleged infringer does not challenge validity, the very existence of the patent with its concomitant presumption of validity satisfies the patentee's burden of showing a likelihood of success on the validity issue." *Titan Tire Corp. v. Case New Holland, Inc.*, 566 F.3d 1372, 1377 (Fed. Cir. 2009); *see also* 35 U.S.C. § 282(a) ("A patent shall be presumed valid."). Thus, Olson Kundig has

---

[11] 12th Avenue Iron does not dispute that Olson Kundig is the named applicant and assignee for all four registered Design Patents, nor does it contend that the registration certificates are flawed. (*See* Resp. at 13-15.) While 12th Avenue Iron argues that it is a joint owner of the Design Patents because of the alleged partnership between the parties, it provides no support for that contention aside from its arguments regarding the existence of a partnership (*see id.*), which the court has already found to be insufficient, *see supra* Section III.B.1.b. Moreover, even if a partnership existed, that would not automatically entail that 12th Avenue Iron is a joint inventor or owner of the Design Patents. Accordingly, 12th Avenue Iron fails to establish a credible dispute with respect to the inventor and assignee listed in the Design Patents' registration certificates.

1    established a likelihood of success on the issues of its ownership and the validity of the

2    Design Patents.  *See Titan Tire*, 566 F.3d at 1377.

3         An entity with a license to use intellectual property infringes on the licensor's

4    rights by continuing to use the intellectual property after the license is terminated.  *See*

5    *Peer Int'l Corp. v. Pausa Recs., Inc.*, 909 F.2d 1332, 1335-36 (9th Cir. 1990) (finding

6    infringement where former licensee continued to use licensor's copyrighted works after

7    termination of the license).  Here, 12th Avenue Iron admits that "[t]here is no question

8    that the [Tom Kundig] Collection products made by 12th Ave[nue] Iron are those of the

9    design patents."  (Resp. at 13.)  It also admits that it continues to use the Design Patents

10   by manufacturing and selling Tom Kundig Collection products.  (*See id.* at 14; Marks

11   Decl. ¶¶ 46-47, Exs. F-G; Parwani Decl., Exs. 9, 11-14.)  In light of these admissions, the

12   court agrees with Olson Kundig that "the only scenario that could make 12th Avenue

13   Iron's continued usage of Olson Kundig's [Design Patents] permissible is if 12th Avenue

14   Iron met its burden to establish the existence of an oral partnership agreement and

15   evidence that the partnership owned the intellectual property through an assignment or

16   license from Olson Kundig to the partnership (presumably another oral agreement) and

17   from the partnership to 12th Avenue Iron (presumably yet another different oral

18   agreement)."  (Reply at 10.)  However, the court has already concluded that 12th Avenue

19   Iron is not likely to succeed in establishing the existence of a partnership between the

20   //

21   //

22   //

ORDER - 25

parties[12] and that Olson Kundig is likely to succeed in establishing the enforceability of

the Agreement.  *See supra* Section III.B.1.  Thus, after Olson Kundig terminated the

Agreement, 12th Avenue Iron no longer holds a license to make, use, or sell products

covered by the Design Patents.  (*See* Agreement ¶¶ 2.3, 3.2; Parwani Decl. ¶¶ 24-26;

Compl. ¶¶ 48-49.)  The court concludes that it is likely that 12th Avenue Iron's continued

sale and manufacture of the Tom Kundig Collection products without a license

constitutes ongoing infringement of Olson Kundig's Design Patents.  *See Peer Int'l*

*Corp.*, 909 F.2d at 1335-36.  Accordingly, Olson Kundig has established that it is likely

to succeed on its patent infringement claims.

### 3.   Infringement of the OLSON KUNDIG Trademark Under 15 U.S.C. § 1114

To establish federal trademark infringement, a party must demonstrate that it owns

a valid trademark and that the alleged infringer's unauthorized use of the mark is likely to

confuse consumers.  *See* 15 U.S.C. § 1114(1); *Brookfield Commc'ns, Inc. v. W. Coast*

*Entm't Corp.*, 174 F.3d 1036, 1046 (9th Cir. 1999).

The registration certificate for the OLSON KUNDIG mark states that the mark is

registered with the USPTO and lists Olson Kundig as the registrant of the mark.  (*See*

Parwani Decl. ¶ 7, Ex. 1; *see also id.* ¶ 38 (stating that Olson Kundig began using the

OLSON KUNDIG mark "as [an] indicator[] of its products and designs" long before the

parties' business relationship commenced).)  Registration of a mark with the USPTO is

---

[12] Even if 12th Avenue Iron had established the existence of a partnership, 12th Avenue
Iron would not be shielded from liability because it has not made any effort to establish the
layers of necessary oral agreements concerning intellectual property licensing.  (Reply at 10.)

1   "prima facie evidence of the validity of the mark, the registrant's ownership of the mark,

2   and the registrant's exclusive right to use the mark in connection with the goods specified

3   in the registration." *Pom Wonderful LLC v. Hubbard*, 775 F.3d 1118, 1124 (9th Cir.

4   2014) (citing 15 U.S.C. § 1115(a)); *Hollywood Athletic Club Licensing Corp. v.

5   GHAC-CityWalk*, 938 F. Supp. 612, 614 (C.D. Cal. 1996) ("A plaintiff makes a prima

6   facie showing of ownership of a protectable trademark by producing a certificate of

7   registration." (citing 15 U.S.C. § 1057(b))).  When proof of registration is uncontested,

8   the ownership interest and valid trademark elements of a trademark infringement claim

9   are met.  *See Sengoku Works Ltd. v. RMC Int'l, Ltd.*, 96 F.3d 1217, 1219-20 (9th Cir.), *as

10   modified*, 97 F.3d 1460 (9th Cir. 1996); *Zobmondo Entm't, LLC v. Falls Media, LLC*, 602

11   F.3d 1108, 1114 (9th Cir. 2010).  Because 12th Avenue Iron did not submit evidence or

12   arguments attacking the OLSON KUNDIG mark's registration (*see generally* Resp.),[13]

13   Olson Kundig has established a likelihood of success on the issue of its ownership of the

14   OLSON KUNDIG mark and the mark's validity.

15        "Where a licensee persists in the unauthorized use of a licensor's trademark,

16   courts have found that the continued use alone establishes a likelihood of consumer

17   confusion."[14]  *Robert Trent Jones II, Inc. v. GFSI, Inc.*, 537 F. Supp. 2d 1061, 1065 (N.D.

18   

19        [13] The court has concluded that 12th Avenue Iron is not likely to succeed in establishing
20   the existence of a partnership between the parties and that Olson Kundig is likely to succeed in
     establishing that the Agreement is enforceable.  *See supra* Section III.B.1.  Thus, to the extent
21   12th Avenue Iron contends that it should be considered a joint owner of the OLSON KUNDIG
     mark because of the parties' alleged partnership, that argument fails.

22        [14] The likelihood of confusion inquiry focuses on "whether a reasonably prudent
     consumer in the marketplace is likely to be confused as to the origin or source of the goods or

1    Cal. 2008) (noting that there is no need to compare the plaintiff's marks or products with

2    defendant's marks or products under the *Sleekcraft* factors in a dispute between a licensee

3    and licensor because "they are identical by virtue of the Agreement") (quoting *Sun*

4    *Microsystems v. Microsoft Corp.*, 999 F. Supp. 1301, 1311 (N.D. Cal. 1998) (concluding

5    that plaintiff "demonstrated a likelihood of success of establishing a likelihood of

6    confusion caused by" the licensee's continued and unauthorized use of the plaintiff's

7    trademark)).[15]

8        Here, 12th Avenue Iron admits its ongoing use of the OLSON KUNDIG mark

9    through its continued sale and manufacturing of Tom Kundig Collection products.  (*See*

10   Resp. at 14; Marks Decl. ¶¶ 46-47, Exs. F-G; *see also* Parwani Decl., Exs. 9, 11-14.)

11   Having found that the Agreement is likely enforceable and that the existence of a

12   partnership between the parties is unlikely, *see supra* Section III.B.1, the court concludes

13

14   _____

     services bearing one of the marks or names at issue in the case."  *Rearden LLC v. Rearden Com.,*

15   *Inc.*, 683 F.3d 1190, 1209 (9th Cir. 2012).

16       [15] *See also, e.g.*, *Hollywood Athletic Club*, 938 F. Supp. at 614 (unauthorized use of
     identical marks after termination of licensing agreement established likelihood of confusion);

17   *Wetzel's Pretzels, LLC v. Johnson*, 797 F. Supp. 2d 1020, 1028 (C.D. Cal. 2011) ("Continued use
     by former franchisee, dealer or licensee of the mark constitutes a fraud on the public, since they
     are led to think that the continuing user is still connected with the trademark owner."  (quoting J.

18   Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 25:31 (5th ed. 2022)));
     *2Die4Kourt v. Hillair Cap. Mgmt., LLC*, No. SACV1601304JVSDFMX, 2016 WL 4487895, at

19   *6 (C.D. Cal. Aug. 23, 2016), *aff'd*, 692 F. App'x 366 (9th Cir. 2017) (concluding that former
     licensee's continued use of plaintiff's trademarks without authorization "will likely confuse

20   consumers"); *LINE-X LLC v. Tefft*, No. 5:20-CV-01707-SB-SHK, 2021 WL 4722662, at *3
     (C.D. Cal. Feb. 22, 2021) ("Plaintiffs executed a valid termination of the franchise agreement

21   and, consequently, Defendants continued use of the trademarks after that termination is sufficient
     to establish a likelihood of confusion."); *State of Idaho Potato Comm'n v. G & T Terminal*

22   *Packaging, Inc.*, 425 F.3d 708, 721 (9th Cir. 2005) (stating that "many courts have held that an
     ex-licensee's continued use of a trademark is enough to establish likelihood of confusion").

1    that 12th Avenue Iron's license to use the OLSON KUNDIG mark was terminated no

2    later than May 28, 2022[16] and that, as a result, any continuing use of the mark is

3    unauthorized.  (*See* Agreement ¶¶ 2.3, 3.2.)  The court agrees with Olson Kundig that by

4    continuing to display the OLSON KUNDIG mark on its official website and sell the Tom

5    Kundig Collection products "after the termination of its license, 12th Avenue Iron is

6    deceiving the public, suggesting to consumers at large that it is still associated, or

7    affiliated, with Olson Kundig when in fact it is not."  (Mot. at 12; *see also* Parwani Decl.

8    ¶ 37); *see, e.g.*, *Sizzler USA Franchise Inc. v. Advanced Home Care Med. Supply, Inc.*,

9    No. CV 08-1856 PSG (RZX), 2008 WL 11338554, at *2 (C.D. Cal. May 6, 2008)

10   (finding that defendants' continued operation of their restaurant using Sizzler's marks

11   after Sizzler's termination of defendants' license "falsely implies that their restaurant is

12   affiliated with Sizzler").  Thus, 12th Avenue Iron's continued and unauthorized use of the

13   OLSON KUNDIG mark will likely confuse consumers.  Accordingly, the court

14   concludes that Olson Kundig has demonstrated a likelihood of success on its federal

15   trademark infringement claim.

16   //

17   //

18

19       [16] Olson Kundig delivered a letter to 12th Avenue Iron on April 28, 2022, notifying 12th
     Avenue Iron of its breach of the Agreement and Olson Kundig's intent to terminate the
20   Agreement in accordance with Paragraphs 3.2 and 3.3 of the Agreement.  (*See* Parwani Decl.
     ¶¶ 24-25, Ex. 10.)  12th Avenue Iron failed to take any action to remedy its alleged breaches.
21   (*See* Parwani Decl. ¶ 26; Compl. ¶ 48.)  Accordingly, the court concludes that it is likely that the
     Agreement was terminated no later than May 28, 2022, whether through the Agreement's
22   no-fault termination clause or through the termination for breach clause.  (*See* Compl. ¶ 49;
     Agreement ¶¶ 3.2-3.3 (describing the Agreement's termination mechanisms).)

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22

4. <u>Infringement of the TOM KUNDIG COLLECTION Trademark Under Washington Common Law</u>

"Where an alleged trademark has not been registered under state or federal law, an allegation of trademark infringement must be tested by rules of common law." *Unisplay S.A. v. Am. Elec. Sign Co. Inc.*, No. CS-92-214-JLQ, 1993 WL 493857, at *10 (E.D. Wash. May 26, 1993), *aff'd*, 69 F.3d 512 (Fed. Cir. 1995); *see also* RCW 19.77.900 ("Nothing herein shall adversely affect the rights or the enforcement of rights in trademarks acquired in good faith at common law . . . ."). To prevail on a trademark or trade name infringement claim for an unregistered mark or name, Olson Kundig must demonstrate both that (1) it owns a valid trademark or trade name and (2) 12th Avenue Iron's unauthorized use of the mark or name is likely to cause consumer confusion. *See Seattle Endeavors, Inc. v. Mastro*, 868 P.2d 120, 124-25 (Wash. 1994) (noting that the plaintiff "must establish the defendant has infringed on a distinctive feature of his name in a manner that tends to confuse the two businesses in the public mind").

To begin, 12th Avenue Iron does not challenge the validity of the TOM KUNDIG COLLECTION mark (*see generally* Resp. at 13-15), and the court finds that the mark is likely a valid, protectable trademark. *See Glow Indus., Inc. v. Lopez*, 252 F. Supp. 2d 962, 976-77 (C.D. Cal. 2002) (noting that a valid, protectable trademark or trade name is either (1) inherently distinctive or (2) has acquired secondary meaning associated with the trademark holder's business); *Seattle Endeavors*, 868 P.2d at 124-25 (evaluating whether the trade name "Willows Apartments" was valid and protectable and the strength of the protectable trademark interest in the distinctive feature of the name); *Nordstrom,*

*Inc. v. Tampourlos*, 717 P.2d 293, 295 (Wash. Ct. App. 1986), *rev'd on other grounds*, 733 P.2d 208 (Wash. 1987) ("'Nordstrom' is a family name used for many years by the plaintiff in a consistent form as a logo identifying a growing number of successful shoe and apparel stores over the western United States.  As such, the trade name 'Nordstrom' has acquired a secondary meaning, which is entitled to protection from unauthorized use."); (*see also* Mot. at 13 (arguing that the "general consuming public of Washington State recognizes and relies upon the TOM KUNDIG COLLECTION mark as an indicator of the high quality associated with the products designed by Olson Kundig"); Compl. ¶ 138 (same); Parwani Decl. ¶¶ 6, 34 (discussing how Olson Kundig has developed and promoted the Tom Kundig Collection over the last decade "by using or promoting the TOM KUNDIG COLLECTION mark through media and magazines"); *id.* ¶ 38 (stating that Olson Kundig has used "Tom Kundig's name" as an indicator of its products and designs for decades)).

　　　　Turning to the issue of ownership, "[t]he right to use a particular name as a trade name belongs to the one who first appropriates and uses it in connection with a particular business." *Seattle St. Ry. & Mun. Emps. Relief Ass'n v. Amalgamated Ass'n of St., Elec. Ry. & Motor Coach Emps.*, 101 P.2d 338, 343 (Wash. 1940) (stating that "it is not necessary that the name be used for any considerable length of time").  Here, Olson Kundig and 12th Avenue Iron were together the first to appropriate and use the TOM KUNDIG COLLECTION mark in connection with the design, marketing, manufacturing,

//

//

1    and sale of the Tom Kundig Collection products.[17]  (*See, e.g.*, Marks Decl. ¶¶ 11-14, 42;

2    Parwani Decl. ¶¶ 6, 34, 38; *id.* ¶ 33, Ex. 15.)  The Agreement, however, provides that

3    Olson Kundig owns "all intellectual property rights in and to the" Tom Kundig

4    Collection products, including any trademarks that were created during the course of the

5    parties' business relationship.  (Agreement ¶ 2.1.)  Thus, because the court has concluded

6    that the Agreement is likely enforceable, it also concludes that Olson Kundig is likely to

7    succeed in establishing that it is the sole owner of the TOM KUNDIG COLLECTION

8    mark. *See Sengoku Works*, 96 F.3d at 1221 (noting that courts, in determining who has

9    priority ownership of a trademark, must first look to the language of any agreement

10   between the parties regarding trademark rights).

11           As to the likelihood of confusion, a party can rely on indications of public

12   confusion to establish that injunctive relief is warranted; proof of actual confusion is not

13   required.  *See Money Savers Pharmacy, Inc. v. Koffler Stores (Western) Ltd.*, 682 P.2d

14   960, 963 (Wash. Ct. App. 1984); *see also Seattle St. Ry.*, 101 P.2d at 344 ("It is enough if

15   the one so resembles another as to deceive or mislead persons of ordinary caution into the

16   belief that they are dealing with the one concern when in fact they are dealing with the

17   other."); *Olympia Brewing Co. v. Nw. Brewing Co.*, 35 P.2d 104, 107 (Wash. 1934)

18   ("The question to be determined in every case is whether . . . defendant . . . is by his

19   conduct passing off his goods as plaintiff's goods, or his business as plaintiff's business.

20

21           [17] The parties have continued to use the TOM KUNDIG COLLECTION mark in
     connection with the Tom Kundig Collection products since the Collection's launch in 2012.
22   (*See, e.g.*, Parwani Decl. ¶¶ 4, 6, 34; *id.*, Exs. 9, 11-14; Marks Decl. ¶¶ 13-14, 42, 46-47, Exs.
     F-G.)

1   The universal test question is whether the public is likely to be deceived.").  After Olson

2   Kundig terminated the Agreement, 12th Avenue Iron no longer holds a license to use the

3   TOM KUNDIG COLLECTION mark.  (*See* Agreement ¶¶ 2.3, 3.2; Parwani Decl.

4   ¶¶ 24-26; *see also* Compl. ¶¶ 48-49); *supra* Section III.B.1 (finding that the Agreement is

5   likely enforceable and that the existence of a partnership is unlikely).  Thus, the court

6   agrees with Olson Kundig that 12th Avenue Iron's unauthorized use of the TOM

7   KUNDIG COLLECTION mark is likely to confuse, mislead, or deceive consumers,

8   "because in the public mind, the products currently being displayed under the Tom

9   Kundig Collection on 12th Avenue Iron's official website still originate from, are

10  associated with, or endorsed by, Olson Kundig, when in fact [they are] not."  (Mot. at

11  13-14; *see* Parwani Decl. ¶ 37 (discussing evidence of consumer dissatisfaction and

12  misattribution); Resp. at 14 (admitting continued usage); Marks Decl. ¶¶ 46-47, Exs. F-G

13  (establishing the same); Parwani Decl., Exs. 9, 11-14 (same)); *see, e.g.*, *Wetzel's Pretzels*,

14  797 F. Supp. 2d at 1028 (stating that a licensee's continued use of the licensor's

15  trademark after the termination of its license "constitutes a fraud on the public, since they

16  are led to think that the continuing user is still connected with the trademark owner"

17  (quoting McCarthy, *supra*, § 25:31)).  Accordingly, the court concludes that Olson

18  Kundig is likely to succeed on its trademark infringement claim under Washington

19  common law.

20  **C.   Likelihood of Irreparable Harm**

21       "A plaintiff seeking a preliminary injunction must demonstrate that irreparable

22  injury is likely in the absence of preliminary relief.  Mere possibility of harm is not

1   enough." *Enyart v. Nat'l Conference of Bar Exam'rs*, 630 F.3d 1153, 1165 (9th Cir.

2   2011) (citation omitted).  "Irreparable harm is traditionally defined as harm for which

3   there is no adequate legal remedy, such as an award of damages." *Ariz. Dream Act Coal.*

4   *v. Brewer*, 757 F.3d 1053, 1068 (9th Cir. 2014).  Because of the difficulty of valuing

5   goodwill and reputation, courts have recognized that "evidence of loss of control over

6   business reputation and damage to goodwill [can] constitute irreparable harm." *Herb*

7   *Reed Enters., LLC v. Fla. Ent. Mgmt., Inc.*, 736 F.3d 1239, 1250 (9th Cir. 2013); *see also*

8   *Pom Wonderful LLC v. Pur Beverages LLC*, No. CV1306917MMMCWX, 2015 WL

9   10433693, at *12 (C.D. Cal. Aug. 6, 2015) (noting that, in a trademark infringement case,

10  "one way to show a likelihood of future irreparable harm is to show that there has, to

11  date, been *some* actual confusion or harm" (emphasis in original)); *Celsis In Vitro, Inc. v.*

12  *CellzDirect, Inc.*, 664 F.3d 922, 930 (Fed. Cir. 2012) (holding that damage to ongoing

13  customer relationships and loss of customer goodwill constitutes irreparable harm in

14  patent infringement context).

15      As discussed above, 12th Avenue Iron continues to use the Marks and Design

16  Patents through its manufacturing, marketing, and sale of Tom Kundig Collection

17  products.  (*See* Resp. at 14; Marks Decl. ¶¶ 46-47, Exs. F-G; Parwani Decl., Exs. 9,

18  11-14.)  12th Avenue Iron's unauthorized use of Olson Kundig's Marks and Design

19  Patents likely confuses the public regarding Olson Kundig's affiliation with 12th Avenue

20  Iron and the products it sells and "deprives Olson Kundig of the opportunity to control

21  the products as well as the services associated with Olson Kundig's [M]arks and patented

22  design[s]."  (Mot. at 16; *see* Parwani Decl. ¶¶ 36-38); *see also Paisa, Inc. v. N & G Auto,*

1  *Inc.*, 928 F. Supp. 1009, 1013 (C.D. Cal. 1996) ("A [licensee] who once possessed

2  authorization to use the trademarks of its [licensor] becomes associated in the public's

3  mind with the trademark holder.  When [a licensee] loses its authorization yet continues

4  to use the mark, the unauthorized use confuses . . . the public."  (citation omitted)).  Thus,

5  a customer who is dissatisfied with the Tom Kundig Collection products or the manner in

6  which 12th Avenue Iron fulfilled their order is unlikely to continue buying Tom Kundig

7  Collection products and may make negative statements about the products to other

8  potential customers.  *See, e.g.*, *Am. Rena Int'l Corp v. Sis-Joyce Int'l Co. Ltd.*, No.

9  CV1206972DMGJEMX, 2012 WL 12538385, at *9 (C.D. Cal. Oct. 15, 2012), *aff'd*, 534

10 F. App'x 633 (9th Cir. 2013) (finding a loss of control over plaintiff's business reputation

11 based on defendants' sales of a product under plaintiff's trademarks "that customers find

12 does not work well").  It is likely that such negative experiences will be wrongfully

13 attributed to Olson Kundig based on 12th Avenue Iron's unauthorized use of its Marks

14 and Design Patents and will irreparably harm Olson Kundig's reputation and customer

15 goodwill.  (*See* Compl. at ¶¶ 10-11, 35 (alleging that Olson Kundig has developed

16 significant goodwill and a strong reputation over the course of several decades); Parwani

17 Decl. ¶¶ 2-3, 27, 36, 38 (same); *see also* Mot. at 17 (claiming that Olson Kundig enjoys

18 "a valuable recognition among the trade and purchasing public with respect to its

19 architectural design" "due to the excellent quality of the products designed by it" and its

20 "extensive promotion and advertisement . . . of its architectural design").)

21        According to Olson Kundig, customer misattribution and dissatisfaction have in

22 fact occurred.  Mr. Parwani states that "Olson Kundig has received complaints from its

1    clients regarding 12th Avenue Iron's services and failure to timely produce the orders it

2    took from Olson Kundig clients," as well as inquiries from clients "asking Olson Kundig

3    to do something about the late order[s] or bad service from 12th Avenue Iron."[18]

4    (Parwani Decl. ¶ 37.)  Such evidence "substantiates the threat to [Olson Kundig's]

5    goodwill and reputation."  *See Life Alert Emergency Response, Inc. v. LifeWatch, Inc.*,

6    601 F. App'x 469, 473-74 (9th Cir. 2015) (finding irreparable harm in the face of

7    "numerous and persistent complaints from would-be customers" along with emails and

8    social media posts from confused consumers).[19]  Accordingly, Olson Kundig has

9    established a likelihood of irreparable harm to its goodwill and reputation in the absence

10   of injunctive relief.  *See id.* ("This material substantiates the threat to Life Alert's

11   reputation and goodwill.  This type of harm constitutes irreparable harm, as it is not

12   readily compensable.").

13

---

14   [18] 12th Avenue Iron states that Mr. Parwani's statements regarding customer complaints
      are "inadmissible hearsay."  (*See* Resp. at 15.)  However, "[d]ue to the urgency of obtaining a

15   preliminary injunction at a point when there has been limited factual development, the rules of
      evidence do not apply strictly to preliminary injunction proceedings."  *Herb Reed*, 736 F.3d at

16   1250 n.5; *see also Johnson v. Couturier*, 572 F.3d 1067, 1083 (9th Cir. 2009) ("A district court
      may, however, consider hearsay in deciding whether to issue a preliminary injunction.").

17   Accordingly, the court will consider Mr. Parwani's statements in assessing the evidence of
      irreparable harm.

18   [19] *See also, e.g., Home Comfort Heating & Air Conditioning, Inc. v. Ken Starr, Inc.*, No.
      818CV00469JLSDFM, 2018 WL 3816745, at *7, *9 (C.D. Cal. July 24, 2018) (concluding that

19   Plaintiff "substantiate[d] the threat to [its] goodwill and reputation" by producing "evidence of
      actual confusion, including negative online reviews and customer complaints that were intended

20   for Defendant"); *Hollywood Athletic Club*, 938 F. Supp. at 615 (noting that the licensor's loss of
      control over its trademark mark at the hands of a licensee "is the very thing that constitutes

21   irreparable harm in the licensing context"); *2Die4Kourt*, 2016 WL 4487895, at *7 (finding
      irreparable harm based on the Kardashians' loss of "control over their reputation and good will

22   related to [defendant's] unauthorized use of their trademarks in connection with the design,
      manufacture, and distribution of Kardashian Beauty-branded cosmetic products").

**D.    Balance of Equities**

With respect to the third factor, the court "must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." *Winter*, 555 U.S. at 24 (quoting *Amoco*, 480 U.S. at 542).  However, "when the harm complained of results from a defendant's allegedly infringing conduct, [courts in the Ninth Circuit] have nonetheless approved the entry of a preliminary injunction." *2Die4Kourt v. Hillair Cap. Mgmt., LLC*, 692 F. App'x 366, 369 (9th Cir. 2017) (affirming grant of preliminary injunction to trademark owner even though defendant argued that an injunction would force it to shut down its business, terminate its employees, and default on its obligations to creditors and distributors); *see also Am. Rena Int'l Corp. v. Sis-Joyce Int'l Co.*, 534 F. App'x 633, 636 (9th Cir. 2013) ("That the present injunction will allegedly drive Sis-Joyce out of business does not weigh in Sis-Joyce's favor where it appears that Sis-Joyce's entire business model is premised on its infringing use of the ARëna mark.").

Olson Kundig and 12th Avenue Iron each maintains that the balance of hardships favors it.  (*See* Resp. at 17-20; Mot. at 15-18; Reply at 10-12.)  The court concludes, however, that the balance of hardships, although close, tips in Olson Kundig's favor.  As explained above, Olson Kundig is likely to suffer irreparable harm to its goodwill and reputation in the absence of injunctive relief in light of 12th Avenue Iron's ongoing, unauthorized usage of Olson Kundig's Marks and Design Patents.  *See supra* Section III.C; *see, e.g.*, *2Die4Kourt*, 692 F. App'x at 369 (concluding that defendant's unauthorized use of plaintiff's trademarks to release products after the termination of the

1    licensing agreement was enough to support a finding that plaintiff would lose some

2    measure of control over its business reputation and thus be irreparably harmed in the

3    absence of injunctive relief).

4           12th Avenue Iron also demonstrates that it will likely suffer irreparable harm if

5    enjoined from continuing to use Olson Kundig's Marks and Design Patents because an

6    injunction would leave it "unable to fulfill its current orders resulting in an immediate

7    loss of sales in the amount of $391,418.95 and loss of customer goodwill" and would

8    effectively force it "to shut down all business operations and layoff seven" given its lack

9    of customers outside of the Tom Kundig Collection.  (*See* Resp. at 17-20.)  However, the

10   harm that 12th Avenue Iron will allegedly suffer if enjoined is a result of activities that

11   the court has found likely to be infringing.  *See supra* Sections III.B.2-4; *2Die4Kourt*,

12   692 F. App'x at 369.  Olson Kundig notified 12th Avenue Iron of its intent to terminate

13   the Agreement and of 12th Avenue Iron's breaches and reminded 12th Avenue Iron of its

14   post-termination contractual obligations.  (*See* Parwani Decl. ¶¶ 24-25, Ex. 10 (breach

15   and termination notice letter); *see also* Answer ¶ C35 (noting that 12th Avenue Iron

16   received the letter).)  Thus, 12th Avenue Iron was aware that it would no longer have a

17   license to use Olson Kundig's Marks and Design Patents after the termination of the

18   Agreement.  Nevertheless, 12th Avenue Iron continued to use the Marks and Design

19   Patents to manufacture, market, and sell Tom Kundig Collection products after the

20   termination became effective, despite its clear obligations under the Agreement to cease

21   such activities.  (*See* Parwani Decl. ¶¶ 26, 39; *id.*, Exs. 9, 11-14; Resp. at 14; Marks Decl.

22   ¶¶ 46-47, Exs. F-G; Agreement ¶ 3.2); *see also Cadence Design Sys. v. Avant! Corp.*, 125

1    F.3d 824, 829 (9th Cir. 1997) (stating that a defendant who knowingly infringes "cannot

2    complain" when properly required to cease infringing activities).  As such, the court

3    concludes that the potential damage to 12th Avenue Iron's business resulting from an

4    injunction does not justify withholding injunctive relief.  *See, e.g.*, *Wetzel's Pretzels*, 797

5    F. Supp. 2d at 1029 (finding likelihood of irreparable harm to trademark holder's

6    goodwill and reputation outweighed the harm that defendant, a small business, would

7    likely face if enjoined because while defendant "would suffer a loss of revenue" and "its

8    employees would, in all likelihood, lose their employment, it is [d]efendants who brought

9    on those risks"); *2Die4Kourt*, 2016 WL 4487895, at *10 ("[A] denial of injunctive relief

10   here would reward Haven Beauty for its misconduct.").

11           Accordingly, the court concludes that the equities do not weigh in 12th Avenue

12   Iron's favor.  *See, e.g.*, *Wecosign, Inc. v. IFG Holdings, Inc.*, 845 F. Supp. 2d 1072, 1084

13   (C.D. Cal. 2012) ("[T]he balance of hardships favors Plaintiff because without an

14   injunction, Plaintiff will lose profits and goodwill, while an injunction will only proscribe

15   Defendants' infringing activities.").  Further, the court reminds 12th Avenue Iron that an

16   injunction will not prevent it from engaging in any other lawful business.

17   **E.     Public Interest**

18           Finally, the court must weigh the impact of a preliminary injunction on the public

19   interest.  In trademark and patent cases, the public has an interest in ensuring that courts

20   protect the legal rights of patent and trademark holders and in preventing consumer

21   confusion or deception.  *See e.g.*, *Brookfield*, 174 F.3d at 1066 (finding injunctive relief

22   appropriate "to prevent irreparable injury to [plaintiff's] interests in its trademark" and

1    "to promote the public interest in protecting trademarks generally"); *Abbott Labs. v.*

2    *Andrx Pharm., Inc.*, 452 F.3d 1331, 1348 (Fed. Cir. 2006) ("[A]bsent any other relevant

3    concerns . . . the public is best served by enforcing patents that are likely valid and

4    infringed."); *Internet Specialties West, Inc. v. Milon-DiGiorgio Enters., Inc.*, 559 F.3d

5    985, 993 (9th Cir. 2009) (noting that an injunction that seeks to prevent confusion to

6    consumers in a trademark case is in the public interest).

7              As discussed above, Olson Kundig has established that it is more likely than not

8    that the Marks and Design Patents are valid; that Olson Kundig owns the Marks and

9    Design Patents; and that 12th Avenue's continued use of Olson Kundig's Marks and

10   Design Patents is unauthorized because 12th Avenue Iron no longer holds a license to use

11   the Marks and Design Patents.  *See supra* Section III.B (concluding that Olson Kundig

12   has demonstrated that the Agreement is likely enforceable and that it is likely to succeed

13   on its patent and trademark infringement claims); (*see also* Resp. at 14 (admitting that

14   12th Avenue Iron continues to use the Marks and Design Patents)).  As Olson Kundig

15   asserts, such unauthorized use is likely to mislead the public "because in the public mind,

16   the products currently being displayed under the Tom Kundig Collection line on 12th

17   Avenue Iron's official website still originate from, are associated with, or endorsed by,

18   Olson Kundig" (Mot. at 14).  *See, e.g.*, *Paisa*, 928 F. Supp. at 1013 (noting that because a

19   licensee becomes associated in the public's mind with the trademark holder, a licensee's

20   continued use of the trademark without authorization "confuses and defrauds the

21   public").  The public interest is best served by preventing such confusion and protecting

22   Olson Kundig's patent and trademark rights from infringement.  *See, e.g.*, *Treemo, Inc. v.*

ORDER - 40

*Flipboard, Inc.*, 53 F. Supp. 3d 1342, 1368 (W.D. Wash. 2014) (holding that an

injunction would serve public interests of protecting the rights of trademark holders

against infringement and minimizing consumer confusion); *Eko Brands, LLC v. Adrian*

*Rivera Maynez Enters., Inc.*, 325 F. Supp. 3d 1116, 1129 (W.D. Wash. 2018), *aff'd*, 946

F.3d 1367 (Fed. Cir. 2020) ("[The public interest] is better served by recognizing the

property rights conveyed by a patent and giving honor to those rights.").  Accordingly,

this factor weighs in favor of a preliminary injunction.

In sum, the court finds that Olson Kundig has met the requirements for the

issuance of a preliminary injunction.  *See Winter*, 555 U.S. at 20.

## IV.    CONCLUSION

For the foregoing reasons, the court GRANTS Olson Kundig's motion for a

preliminary injunction (Dkt. # 6).  Having concluded that a preliminary injunction is

warranted, the court ORDERS the parties to submit a joint statement, not to exceed ten

(10) pages, that includes the parties' position(s) as to:  (1) the bond amount[20] and (2) the

specific language of the preliminary injunction.[21]  The parties should confer and attempt

to reach agreement on both of the above issues.  If the parties are unable to reach

---

[20] Under Federal Rule of Civil Procedure 65(c), a court may issue a preliminary injunction "only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained."  Fed. R. Civ. P. 65(c).

[21] Rule 65(b) requires that every order granting an injunction must, among other things "state its terms specifically and "describe in reasonable detail—and not by referring to the complaint or other document—the act or acts restrained or required."  Fed. R. Civ. P. 65(d)(1)(B)-(C).  While Olson Kundig's motion includes broad language regarding the acts that it would like the court to restrain or require (*see generally* Mot. at 19; Prop. Order (Dkt. # 6-1)), such broad language does not meet the specificity requirements set forth in Rule 65(d)(1).

1  agreement on all or some of the issues, the parties shall indicate any agreed upon terms

2  and may include separate statements containing their own proposed terms with respect to

3  the remaining areas of dispute.  The parties shall file their statement no later September

4  22, 2022.

5       Dated this 12th day of September, 2022.

6

7

8  JAMES L. ROBART
   United States District Judge

9

10

11

12

13

14

15

16

17

18

19

20

21

22