UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| OLSON KUNDIG, INC., | CASE NO. C22-0825JLR |
| Plaintiff, | ORDER |
| v. | |
| 12TH AVENUE IRON, INC., | |
| Defendant. | |

## I.   INTRODUCTION

Plaintiff Olson Kundig, Inc. ("Olson Kundig") moves to dismiss Defendant 12th Avenue Iron, Inc.'s ("12th Avenue Iron") Washington Uniform Trade Secrets Act ("WUTSA") and Washington Consumer Protection Act ("WCPA") counterclaims.  (Mot. (Dkt. # 36); Reply (Dkt. # 39).[1])  12th Avenue Iron opposes the motion.  (Resp. (Dkt. # 38).)  The court has considered the parties' submissions, the balance of the record, and

---

[1] When citing to the parties' pleadings, the court uses the pleadings' internal pagination unless otherwise stated.

the applicable law.  Being fully advised,[2] the court GRANTS Olson Kundig's motion to

dismiss.

## II.    BACKGROUND

This dispute stems from the parties' business dealings with respect to the "Tom

Kundig Collection"—a hardware and home furnishings line that is, according to 12th

Avenue Iron, "owned and designed by" 12th Avenue Iron and Olson Kundig.  (*See*

*generally* 1st Am. Answer (Dkt. # 34) ¶ C19.[3])

**A.    The Parties**

Stephen Marks is a founder and the current owner of 12th Avenue Iron.  (*See id.*

¶ C7.)  12th Avenue Iron "designs, builds, and installs custom architectural metalwork,

sculpture, and furniture for commercial, residential, and public environments."  (*Id.*

¶ C6.)

Tom Kundig is an architect and an owner and design principal of Olson Kundig,

an architectural firm.  (*See* Compl. (Dkt. # 1) ¶¶ 10-11; 1st Am. Answer ¶ C8.)

According to Olson Kundig, the firm "has been a worldwide leader in architectural

design for several decades"; its work "encompasses museums, commercial and

//

---

[2] Neither party has requested oral argument (*see* Mot. at 1; Resp. at 1), and the court has determined that oral argument would not be helpful to its disposition of the motions, *see* Local Rules W.D. Wash. LCR 7(b)(4).

[3] Because 12th Avenue Iron separately numbers the paragraphs in the counterclaim section of its answer (*see* 1st Am. Answer at 13-27), the court uses "A" to refer to the paragraphs in the answer section and "C" to refer to the paragraphs in the counterclaim section.

mixed-use design, exhibit design, interior design, places of worship, and residences."
(Compl. ¶ 10.)

**B.    The Tom Kundig Collection**

In or about December 2009, Mr. Kundig and Mr. Marks "started discussions concerning the formation of a business relationship between" Olson Kundig and 12th Avenue Iron.  (1st Am. Answer ¶ C9.)  During the parties' discussions, Mr. Marks allegedly proposed that the two companies work together to create a product line for hardware and home furnishings.  (*See id.* ¶¶ C10-12.)

The precise nature of the parties' relationship as well as the existence, validity, and enforceability of any contract or agreement between them remain subject to dispute.  According to 12th Avenue Iron, Mr. Marks and Mr. Kundig "orally agreed that this line of products developed together, although called the 'Tom Kundig Collection[,]' would be a partnership and joint venture."[4]  (*Id.* ¶ C13.)  Although Olson Kundig circulated a written agreement regarding the Tom Kundig Collection at one point, 12th Avenue Iron alleges that the agreement was "never negotiated, discussed, or signed by anyone."  (*Id.* ¶¶ C17-18.)

Leading up to the Tom Kundig Collection's launch in 2012, the parties worked together to create the Tom Kundig Collection products.  (*See id.* ¶¶ C14-16.)  According to 12th Avenue Iron, Mr. Kundig designed and sketched the products while Mr. Marks "researched all the suppliers, vendors, and made rounds of prototypes to create perfect,

---

[4] Olson Kundig disputes 12th Avenue Iron's characterization of the relationship as a partnership.  (*See, e.g.*, Compl. ¶¶ 18-26, 36.)

1  high-end products for the Tom Kundig Collection."  (*Id.* ¶ C16; *see also id.* ¶ C15

2  (claiming that Mr. Marks "invested intensive time and energy developing the sources,

3  products and processes for the [Tom Kundig Collection] product line"); *id.* ¶ C21

4  (alleging that 12th Avenue Iron "fully participated in the design of all the products with

5  Olson Kundig").)

6          12th Avenue Iron claims that since the Collection's launch in 2012, the parties

7  have "had a partnership in designing and manufacturing the products launched under the

8  Tom Kundig Collection."  (*Id.* ¶ C20; *see also id.* ¶¶ C19, C24-25 (explaining that

9  customers could purchase the Tom Kundig Collection products through 12th Avenue

10  Iron's official website, and 12th Avenue Iron was responsible "for all sales transactions

11  as well as delivery and shipping of the products."); *id.* ¶ C23 (alleging that Olson Kundig

12  "relied on 12th Ave[nue] Iron's participation in the design of each of the products in the

13  Tom Kundig Collection as it was necessary to determine the feasibility in the fabrication

14  and development of shop drawings to enable manufacturing of said products"); *id.* ¶ C27

15  ("For over the past ten (10) years, the parties collaborated to design and develop the

16  various products sold on 12th Ave[nue] Iron's website.").)  In light of the significant

17  amount of time that 12th Avenue Iron has spent developing the Tom Kundig Collection,

18  it alleges that it holds "ownership interests in the supplier and vendor information,

19  customer lists developed through its website, as well as design, fabrication, and

20  manufacturing trade secrets and intellectual property to products launched under the Tom

21  Kundig Collection."  (*Id.* ¶¶ C22, C15, C27.)

22  //

**C.      Termination of the Business Relationship Between Olson Kundig and 12th Avenue Iron and Commencement of this Lawsuit**

According to 12th Avenue Iron, "[i]n 2020, due to factors out of 12th Ave[nue] Iron's control, it temporarily fell behind on fulfilling some orders for the Tom Kundig Collection."  (*Id.* ¶ C28.)  Olson Kundig then proposed using another Seattle-based metal fabrication company, Argent Fabrication, LLC ("Argent"), "to assist 12th Ave[nue] Iron in fulfilling its orders."  (*Id.* ¶ C29.)  12th Avenue Iron states that it understood Olson Kundig's proposal as "instructing 12th Ave[nue] Iron to allow Argent to assist 12th Ave[nue] Iron with its orders."  (*Id.* ¶ C31.)  Thus, 12th Avenue Iron "opened its doors and showed everything to Argent – including its supplier and vendor information, customers developed through the website, and of course its design, fabrication, and manufacturing trade secrets and intellectual property developed for the [Tom Kundig Collection]."  (*Id.*; *see also id.* ¶ C34 (claiming that Olson Kundig "pushed for a merger between Argent and 12th Ave[nue] Iron").)

According to 12th Avenue Iron, for several months, Argent sent its crew to fulfill Tom Kundig Collection orders for 12th Avenue Iron, "frequently without properly consulting [Mr. Marks]," and invoiced 12th Avenue Iron over $120,000 for work performed during a three-month period.  (*Id.* ¶ C32.)  12th Avenue Iron and its customers were allegedly dissatisfied with Argent's work product.  (*See id.* ¶ C33 (stating that "Argent's work turned out to be substandard and shoddy" and customers "demanded refunds or refused to pay 12th Ave[nue] Iron until Argent's poor workmanship [was] repaired").)

1    On April 28, 2022, Olson Kundig notified 12th Avenue Iron that Olson Kundig

2  intended to terminate the parties' relationship and demanded that 12th Avenue Iron

3  "remove the Tom Kundig Collection line from its website, return all shop drawings, other

4  designs/drawings, and any other documents provided by or created by Olson Kundig, and

5  return customer's payments for any unfulfilled orders." (*Id.* ¶ C35.)  12th Avenue Iron

6  alleges that Olson Kundig also interfered with its business, leading to significant losses.

7  (*See id.* ¶ C37.)  For instance, according to 12th Avenue Iron, Olson Kundig "sent a mass

8  email to its customers and clients instructing them not only to cease ordering from 12th

9  Ave[nue] Iron, but also to order from Argent instead." (*Id.* ¶ C36.)  As a result, 12th

10  Avenue Iron claims that Olson Kundig is "allowing Argent to use 12th Ave[nue] Iron's

11  trade secrets and intellectual property to make products from the Tom Kundig

12  Collection." (*Id.* ¶ 38.)

13    Because 12th Avenue Iron allegedly continued to manufacture, market, and sell

14  Tom Kundig Collection products after receiving Olson Kundig's termination letter, Olson

15  Kundig commenced this case against 12th Avenue Iron on June 12, 2022.  (*See generally*

16  Compl. ¶¶ 48, 51-56.)  Olson Kundig brings claims against 12th Avenue Iron for:  breach

17  of contract; infringement of the D352, D197, D933 and D422 Design Patents under 35

18  U.S.C. § 271; infringement of the OLSON KUNDIG trademark under 15 U.S.C. § 1114;

19  infringement of the TOM KUNDIG COLLECTION trademark under Washington

20  common law; violation of the Washington Personality Rights Act ("WPRA"), RCW

21  63.60.010 *et seq.*; and violation of the WCPA, RCW 19.86.010 *et seq.*  (*See id.* at 10-20.)

22  12th Avenue Iron brings counterclaims against Olson Kundig for:  breach of contract;

1 unjust enrichment; violation of the WCPA; and violation of the WUTSA, RCW

2 19.108.010 *et seq.* (*See generally* 1st Am. Answer at 18-27; Answer (Dkt. # 12) at

3 18-22.)

4         On September 28, 2022, the court granted in part Olson Kundig's motion to

5 dismiss 12th Avenue Iron's unjust enrichment, WCPA, and WUTSA counterclaims. (*See*

6 *generally* 1st MTD (Dkt. # 19); 9/28/22 Order (Dkt. # 31).) Specifically, the court

7 dismissed 12th Avenue Iron's WUTSA counterclaim because 12th Avenue Iron "failed to

8 adequately (1) describe its alleged trade secrets; (2) identify its efforts to maintain the

9 secrecy of its alleged trade secrets; and (3) establish how its alleged trade secrets were

10 misappropriated." (9/28/22 Order at 24.) The court, however, granted 12th Avenue Iron

11 leave to amend its WUTSA counterclaim. (*Id.*) Additionally, the court dismissed 12th

12 Avenue Iron's WCPA counterclaim without prejudice and without leave to amend

13 pursuant to 12th Avenue Iron's stipulation. (*Id.* at 25; *see* Resp. to 1st MTD (Dkt. # 24)

14 at 7 (agreeing to dismiss its WCPA counterclaim without prejudice and without leave to

15 amend).)

16         12th Avenue Iron timely filed its first amended answer, again bringing

17 counterclaims against Olson Kundig for: breach of contract; unjust enrichment; violation

18 of the WCPA; and violation of the WUTSA, RCW 19.108.010 *et seq.* (*See generally* 1st

19 Am. Answer at 18-27; Dkt.)

20                      **III.   ANALYSIS**

21         Olson Kundig again moves to dismiss 12th Avenue Iron's WUTSA and WCPA

22 counterclaims pursuant to Federal Rule of Civil Procedure 12(b)(6). (*See generally* Mot.)

It argues that the court should dismiss those counterclaims because:  (1) 12th Avenue Iron's WCPA claim is procedurally improper given that the court previously dismissed this claim without leave to amend pursuant to 12th Avenue Iron's stipulation; (2) 12th Avenue Iron's WCPA counterclaim is substantively improper because it "fails to plausibly plead a causal link between 12th Avenue Iron's alleged injury and Olson Kundig's alleged conduct"; and (3) 12th Avenue Iron's WUTSA counterclaim still suffers from the same flaws identified in the court's September 28, 2022 order.  (*See generally id.* at 1.)  12th Avenue Iron again agrees to dismiss its WCPA counterclaim, noting that "it was an unintentional error to not remove" the WCPA counterclaim from its amended answer.  (Resp. at 12.)  On reply, Olson Kundig asks the court to order 12th Avenue Iron to pay the attorneys' fees and costs that Olson Kundig incurred in having to move to dismiss the WCPA counterclaim again.  (*See* Reply at 8-9.)

Because 12th Avenue Iron again agrees to dismiss its WCPA counterclaim. the court will address only 12th Avenue Iron's WUTSA counterclaim below.  The court discusses whether 12th Avenue Iron has sufficiently pled its WUTSA counterclaim before addressing Olson Kundig's request for fees.

**A.     Whether 12th Avenue Iron's WUTSA Counterclaim States a Claim Upon Which Relief Can Be Granted**

The court sets forth the relevant legal standard before analyzing the sufficiency of 12th Avenue Iron's WUTSA counterclaim.

//

//

1          1. <u>Legal Standard</u>

2          Federal Rule of Civil Procedure 12(b)(6) provides for dismissal of a complaint for

3    "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6).  "To

4    survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted

5    as true, to 'state a claim to relief that is plausible on its face.'" *Iqbal*, 556 U.S. at 678

6    (quoting *Twombly*, 550 U.S. at 570).  A claim is facially plausible "when the pleaded

7    factual content allows the court to draw the reasonable inference that the defendant is

8    liable for the misconduct alleged."  *Id.*  While "detailed factual allegations" are not

9    required, a [pleading] must include "more than an unadorned,

10   the-defendant-unlawfully-harmed-me accusation."  *Id.*  The same pleading standard, and

11   standard of review, applies to counterclaims.  *See Starr v. Baca*, 652 F.3d 1202, 1216

12   (9th Cir. 2011) ("[A]llegations in a . . . counterclaim . . . must contain sufficient

13   allegations of underlying facts to give fair notice and to enable the opposing party to

14   defend itself effectively."); *see also Lemman v. Foley*, No. C20-0591JCC, 2020 WL

15   7181055, at *1 (W.D. Wash. Dec. 7, 2020) (noting that a motion to dismiss a

16   counterclaim is evaluated under the same standards applicable to a motion to dismiss a

17   complaint).

18         When considering a Rule 12(b)(6) motion, the court may consider the pleading,

19   documents attached to the pleading, documents incorporated therein, or matters of

20   judicial notice.  *See United States v. Ritchie*, 342 F.3d 903, 908 (9th Cir. 2003);

21   *Daniels-Hall v. Nat'l Educ. Ass'n*, 629 F.3d 992, 998 (9th Cir. 2010).  The court must

22   accept the non-moving party's well-pleaded factual allegations as true and draw all

1   reasonable inferences in favor of the non-moving party.  *See Hines v. Youseff*, 914 F.3d

2   1218, 1227 (9th Cir. 2019); *Daniels-Hall*, 629 F.3d at 998.  However, the court is not

3   required to accept as true "allegations that are merely conclusory, unwarranted

4   deductions of fact, or unreasonable inferences." *Daniels-Hall*, 629 F.3d at 998; *Chavez v.

5   United States*, 683 F.3d 1102, 1008 (9th Cir. 2012) (stating that the court is not required

6   to accept as true legal conclusions or "formulaic recitation[s] of the elements of a cause

7   of action").

8       2.  WUTSA Counterclaim

9       Olson Kundig argues that the court must dismiss 12th Avenue Iron's WUTSA

10  counterclaim because (1) 12th Avenue Iron does not sufficiently plead that it made

11  reasonable efforts to maintain the secrecy of its alleged trade secrets, and (2) 12th

12  Avenue Iron does not sufficiently identify how its alleged trade secrets were

13  misappropriated, as it "fails to plead any facts to show that Olson Kundig disclosed or

14  used any of 12th Avenue Iron's alleged trade secrets."  (*See* Mot. at 2-5; Reply at 2-8.)

15      "A claim under the WUTSA requires a plaintiff to plead (1) the existence of a

16  protectable trade secret, and (2) facts constituting misappropriation." *NW Monitoring

17  LLC v. Hollander*, 534 F. Supp. 3d 1329, 1336 (W.D. Wash. 2021).  In order to state a

18  claim for trade secret misappropriation, a plaintiff must also establish that it made

19  reasonable efforts to maintain the secrecy of its alleged trade secrets.  *See* RCW

20  19.108.010(4).  "[R]easonable efforts to maintain secrecy have been held to include

21  advising employees of the existence of a trade secret, limiting access to a trade secret on

22  need-to-know basis, and controlling plant access." *Machen, Inc. v. Aircraft Design, Inc.*,

1   828 P.2d 73, 76-79 (Wash. Ct. App. 1992), *overruled on other grounds by Waterjet*

2   *Tech., Inc. v. Flow Int'l Corp.*, 996 P.2d 598 (Wash. 2000).  "On the other hand, public

3   disclosure of information . . . can preclude protection."  *Id.*

4         Olson Kundig argues that 12th Avenue Iron's amended answer "still fails to plead

5   facts to show any reasonable efforts it took under the circumstances to safeguard the

6   secrecy of its allegedly protectable trade secrets in connection with its disclosure of these

7   trade secrets to Argent."  (Mot. at 2.)  The court agrees.  12th Avenue Iron continues to

8   admit that it "opened its doors and showed everything to Argent—including its supplier

9   and vendor information, customers developed through the website, and of course its

10  design, fabrication, and manufacturing trade secrets and intellectual property developed

11  for the" Tom Kundig Collection.  (1st Am. Answer ¶ C31.)  As to the Argent employees

12  who assisted 12th Avenue Iron with its manufacturing work, 12th Avenue Iron alleges

13  that it did not provide these employees with "full access to its network and files" but also

14  admits that it gave these employees some access to information it claims are trade secrets.

15  (*See id.* ¶ 79 (alleging that 12th Avenue Iron "concealed available shop drawings and

16  only provided Argent with limited descriptions of items Argent was assisting 12th

17  Ave[nue] Iron with"); *see also id.* ¶ 71 (describing 12th Avenue Iron's alleged trade

18  secrets).)

19        With respect to 12th Avenue Iron's disclosure of these alleged trade secrets to

20  Argent's co-owner Kurt Eckman, 12th Avenue alleges,

21        In the interest of establishing a successful and open partnership, Argent
          co-owner Kurt Eckman was given extensive online access to 12th Ave[nue]
22        Iron's books, its online store featuring the TK Collection, its manufacturing

1    processes and shop drawings, and its relationships with all clients, vendors,
and suppliers.  Mr. Eckman brought his personal laptop to work in the 12th

2    Ave[nue] Iron's office on many occasions.  Much of this information and

3    12th Ave[nue] Iron's trade secrets were taken by Argent's employees by
documentation of these shop drawings and the methods.

4  (*Id.* ¶ 80.)  12th Avenue Iron thus admits that it voluntarily gave Argent extensive access

5  to everything, including 12th Avenue Iron's books, online store featuring the entire Tom

6  Kundig Collection line products, manufacturing processes, shop drawings, and

7  information about its relationship with all clients, vendors, and suppliers (*id.*)—the exact

8  types of materials that12th Avenue Iron claims to be its trade secrets (*see, e.g., id.*

9  ¶ 71)—without taking any steps to safeguard the secrecy of these materials (*see generally*

10  *id.* ¶ 80).  Moreover, 12th Avue Iron again fails to plead any facts to suggest that it

11  advised Argent's co-owner and employees of the existence of its trade secrets and warned

12  them not to disclose such information, limited disclosure of its trade secrets to Argent on

13  any need-to-know basis, required Argent's co-owner and employees to sign

14  confidentiality agreements regarding its alleged trade secrets, or took any other steps to

15  ensure that its alleged trade secrets would be sufficiently protected.  (*See generally id.*);

16  *see, e.g.*, *Machen*, 828 P.2d at 78-79 (dismissing trade secret claim where plaintiff shared

17  its alleged trade secrets with a third party at a trade show but did not present evidence

18  indicating that plaintiff took steps to "see that the information would be protected").

19        12th Avenue Iron argues that it pled sufficient facts to demonstrate its efforts to

20  maintain the secrecy of its alleged trade secrets because it alleged that "12th Ave[nue]

21  Iron maintained its trade secrets by keeping all of its manufacturing in house and

22  choosing not to outsource its jobs to other fabricators" and that "12th Ave. Iron had to

1    continually reinforce and remind its own employees, job superintendents and managing

2    architects that 12th Ave. Iron's product specification drawings could not be given to

3    another fabricator and should be closely held within 12th Ave. Iron's shop."  (1st Am.

4    Answer ¶¶ C72-73; *see* Resp. at 6-7 (referencing these allegations).)  However, the court

5    agrees with Olson Kundig that "these general measures . . . only apply to 12th Avenue

6    Iron's own employees, managing architects, and third-party fabricators (who are not

7    Argent)" and "are not designed to protect the disclosure of information when it comes to

8    Argent in particular."  (Reply at 2-3.)

9            In light of the omissions and admissions identified above regarding Argent's

10   access to the information that 12th Avenue Iron claims are trade secrets (*see, e.g.*, 1st

11   Am. Answer ¶¶ C31, C79-80 (discussing, among other things, Argent's co-owner's

12   "extensive online access" to information 12th Avenue Iron claims are trade secrets, as

13   well as Argent's co-owner's ability to access such information on his personal laptop

14   without any contractual restrictions on his access to, or use of, such information)), the

15   court also agrees with Olson Kundig's contention that "12th Avenue Iron's general and

16   vague protective measures (as applied to its own employees, architects, and non-Argent

17   third-party fabricators) do not sufficiently plead that it took reasonable steps to maintain

18   the secrecy of the information it now claims are trade secrets (Reply at 4).  *See Machen*,

19   828 P.2d at 78 (stating that "general [protective] measures" may not be enough if they are

20   not "designed to protect the disclosure of information").  Accordingly, the court again

21   concludes that 12th Avenue Iron "fails to meet the 'secrecy' element because, not only

22   did it fail to plead any facts to [establish that it took reasonable efforts to] protect the

1    alleged trade secrets, it actually pled facts showing it disclosed its trade secrets to a third

2    party." (*See* 9/28/22 Order at 21 (quoting 1st MTD at 8).[5])  In the absence of factual

3    allegations establishing that 12th Avenue Iron undertook reasonable efforts to protect its

4    trade secrets, 12th Avenue Iron's WUTSA counterclaim cannot survive.[6]  The court

5    therefore GRANTS Olson Kundig's motion to dismiss 12th Avenue Iron's WUTSA

6    counterclaim.

7           Whether to grant leave to amend is generally within the discretion of the district

8    court.  *In re Daisy Sys. Corp.*, 97 F.3d 1171, 1175 (9th Cir. 1996).  This discretion is

9    particularly broad where the plaintiff has previously filed an amended complaint.

10   *Sisseton–Wahpeton Sioux Tribe v. United States*, 90 F.3d 351, 355 (9th Cir. 1996).  Here,

11   12th Avenue Iron has already had an opportunity to remedy the deficiencies with respect

12   to its WUTSA counterclaim (*see* 6/13/22 Order at 17-24; 1st Am. Answer) and has not

13   requested leave to amend nor proposed any new facts or legal theories that it could not

14   have incorporated into prior iterations of its complaint (*see generally* Dkt.; Resp.).  *See,*

15   *e.g.*, *Turner v. Cnty. of Los Angeles*, 18 F. App'x 592, 597 (9th Cir. 2001) (concluding

16   that the court did not abuse its discretion in denying the second amended complaint with

17

18           [5] *See, e.g.*, *Buffets, Inc. v. Klinke*, 73 F.3d 965, 969 (9th Cir. 1996) (affirming dismissal of
19   WUTSA claim based on the reasonableness of the employer's security measures, stating that
     "[e]ven if the [job] manuals were loaned only on a "need-to-know" basis, as OCB claims, the
20   fact that employees were advised of neither the manuals' status as secrets, nor of security
     measures that should be taken to prevent their being obtained by others, suggests that OCB's
     interest in security was minimal").

21           [6] Because 12th Avenue Iron's WUTSA counterclaim fails for this reason, the court does
22   not address Olson Kundig's argument that 12th Avenue Iron also fails to sufficiently identify
     how its alleged trade secrets were misappropriated.  (*See* Mot. at 4-5; Reply at 4-8.)

1  prejudice and without leave to amend where the court had already allowed the plaintiff to

2  amend their complaint with instructions on how to cure the complaint's deficiencies);

3  *Kendall v. Visa U.S.A., Inc.*, 518 F.3d 1042, 1052 (9th Cir. 2008) ("Appellants fail to

4  state what additional facts they would plead if given leave to amend . . . . Accordingly,

5  amendment would be futile.").  Therefore, the court concludes that further amendment to

6  this claim would be futile and DISMISSES 12th Avenue Iron's WUTSA counterclaim

7  with prejudice and without leave to amend.

8  **B.    Olson Kundig's Request for Fees**

9         In its reply, Olson Kundig asks the court to order 12th Avenue Iron to pay the

10  attorneys' fees and costs that Olson Kundig incurred in having to move to dismiss the

11  WCPA counterclaim again.  (*See* Reply at 8-9.)  It argues that such an award is warranted

12  because 12th Avenue Iron's re-assertion of the WCPA counterclaim in its amended

13  answer—after agreeing to, and being ordered to, dismiss the counterclaim without leave

14  to amend—constitutes "unreasonable, reckless, and frivolous conduct."  (*See id.*)  In

15  support of its request, Olson Kundig references 28 U.S.C. § 1927 (*see id.*), which states

16  that "[a]ny attorney . . . who so multiplies the proceedings in any case unreasonably and

17  vexatiously may be required by the court to satisfy personally the excess costs, expenses,

18  and attorneys' fees reasonably incurred because of such conduct."

19         12th Avenue Iron states that "it was an unintentional error to not remove 12th

20  Ave[nue] Iron's WCPA claim in its amended answer."  (Resp. at 12 (stating that 12th

21  Avenue Iron "does not object to dismissal of its WCPA [c]ounterclaim").)  At present,

22  the court cannot conclude that 12th Avenue Iron's conduct was unreasonable or

vexatious.  Instead, the court accepts 12th Avenue Iron's characterization of its failure to remove the WCPA counterclaim as an unintentional mistake.  (*Id.*)  Accordingly, the court declines to order 12th Avenue Iron to pay Olson Kundig's attorneys' fees and expenses associated with bringing the instant motion to dismiss 12th Avenue Iron's WCPA counterclaim.

## IV.   CONCLUSION

For the foregoing reasons, the court GRANTS Olson Kundig's motion to dismiss 12th Avenue Iron's WUTSA and WCPA counterclaims (Dkt. # 36).  Specifically, the court (1) DISMISSES 12th Avenue Iron's WCPA counterclaim without prejudice and without leave to amend pursuant to 12th Avenue Iron's stipulation (Resp. at 12) and (2) DISMISSES 12th Avenue Iron's WUTSA counterclaim with prejudice and without leave to amend.  Further, the court DENIES Olson Kundig's request for payment of its attorneys' fees and expenses associated with bringing the instant motion to dismiss 12th Avenue Iron's WCPA counterclaim (Reply at 8-9).

Dated this 16th day of November, 2022.

JAMES L. ROBART
United States District Judge